# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 15, 2016        Decided February 21, 2017

No. 14-5243

PERRY CAPITAL LLC, FOR AND ON BEHALF OF INVESTMENT
FUNDS FOR WHICH IT ACTS AS INVESTMENT MANAGER,
APPELLANT

v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY AS THE
SECRETARY OF THE DEPARTMENT OF THE TREASURY, ET AL.,
APPELLEES

Consolidated with 14-5254, 14-5260, 14-5262

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01025)
(No. 1:13-cv-01053)
(No. 1:13-cv-01439)
(No. 1:13-cv-01288)

*Theodore B. Olson* argued the cause for Perry Capital
LLC, *et al*. With him on the briefs were *Douglas R. Cox*,
*Matthew D. McGill*, *Charles J. Cooper*, *David H. Thompson*,
*Peter A. Patterson*, *Brian W. Barnes*, *Drew W. Marrocco*,
*Michael H. Barr*, *Richard M. Zuckerman*, *Sandra Hauser*, and
*Janet M. Weiss*.

*Hamish P.M. Hume* argued the cause for American European Insurance Company, *et al.* With him on the briefs were *Matthew A. Goldstein*, *David R. Kaplan*, and *Geoffrey C. Jarvis*.

*Thomas P. Vartanian*, *Steven G. Bradbury*, *Robert L. Ledig*, and *Robert J. Rhatigan* were on the brief for *amici curiae* the Independent Community Bankers of America, the Association of Mortgage Investors, Mr. William M. Isaac, and Mr. Robert H. Hartheimer in support of appellants.

*Thomas F. Cullen*, *Jr.*, *Michael A. Carvin*, *James E. Gauch*, *Lawrence D. Rosenberg*, and *Paul V. Lettow* were on the brief for *amici curiae* Louise Rafter, Josephine and Stephen Rattien, and Pershing Square Capital Management, L.P. in support of appellants and reversal.

*Jerrold J. Ganzfried* and *Bruce S. Ross* were on the brief for *amici curiae* 60 Plus Association, Inc. in support of reversal.

*Eric Grant* was on the brief for *amicus curiae* Jonathan R. Macey in support of appellants and reversal.

*Thomas R. McCarthy* was on the brief for *amici curiae* Timothy Howard and The Coalition for Mortgage Security in support of appellants.

*Myron T. Steele* was on the brief for *amicus curiae* Center for Individual Freedom in support of appellants.

*Michael H. Krimminger* was on the brief for *amicus curiae* Investors Unite in support of appellants for reversal.

*Howard N. Cayne* argued the cause for appellees Federal Housing Finance Agency, *et al.* With him on the brief were *Paul D. Clement*, *D. Zachary Hudson*, *Michael J. Ciatti*, *Graciela Maria Rodriguez*, *David B. Bergman*, *Michael A.F. Johnson*, *Dirk C. Phillips*, and *Ian S. Hoffman*.

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellee Steven T. Mnuchin. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Beth S. Brinkmann*, Deputy Assistant Attorney General, *Alisa B. Klein*, *Abby C. Wright*, and *Gerard Sinzdak*, Attorneys.

*Dennis M. Kelleher* was on the brief for *amicus curiae* Better Markets, Inc. in support of appellees and affirmance.

*Pierre H. Bergeron* was on the brief for *amicus curiae* Black Chamber of Commerce in support of neither party.

Before: BROWN and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT and *Senior Circuit Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* BROWN.

MILLETT, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*: In 2007–2008, the national economy went into a severe recession due in significant part to a dramatic decline in the housing market. That downturn pushed two central players in the United States' housing mortgage market—the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie")—to the brink of collapse. Congress

concluded that resuscitating Fannie Mae and Freddie Mac was vital for the Nation's economic health, and to that end passed the Housing and Economic Recovery Act of 2008 ("Recovery Act"), Pub. L. No. 110-289, 122 Stat. 2654 (codified, as relevant here, in various sections of 12 U.S.C.). Under the Recovery Act, the Federal Housing Finance Agency ("FHFA") became the conservator of Fannie Mae and Freddie Mac.

In an effort to keep Fannie Mae and Freddie Mac afloat, FHFA promptly concluded on their behalf a stock purchase agreement with the Treasury Department, under which Treasury made billions of dollars in emergency capital available to Fannie Mae and Freddie Mac (collectively, "the Companies") in exchange for preferred shares of their stock. In return, Fannie and Freddie agreed to pay Treasury a quarterly dividend in the amount of 10% of the total amount of funds drawn from Treasury. Fannie's and Freddie's frequent inability to make those dividend payments, however, meant that they often borrowed more cash from Treasury just to pay the dividends, which in turn increased the dividends that Fannie and Freddie were obligated to pay in future quarters. In 2012, FHFA and Treasury adopted the Third Amendment to their stock purchase agreement, which replaced the fixed 10% dividend with a formula by which Fannie and Freddie just paid to Treasury an amount (roughly) equal to their quarterly net worth, however much or little that may be.

A number of Fannie Mae and Freddie Mac stockholders filed suit alleging that FHFA's and Treasury's alteration of the dividend formula through the Third Amendment exceeded their statutory authority under the Recovery Act, and constituted arbitrary and capricious agency action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). They also claimed that FHFA, Treasury, and the Companies

committed various common-law torts and breaches of contract by restructuring the dividend formula.

We hold that the stockholders' statutory claims are barred by the Recovery Act's strict limitation on judicial review. *See* 12 U.S.C. § 4617(f). We also reject most of the stockholders' common-law claims. Insofar as we have subject matter jurisdiction over the stockholders' common-law claims against Treasury, and Congress has waived the agency's immunity from suit, those claims, too, are barred by the Recovery Act's limitation on judicial review. *Id.* As for the claims against FHFA and the Companies, some are barred because FHFA succeeded to all rights, powers, and privileges of the stockholders under the Recovery Act, *id.* § 4617(b)(2)(A); others fail to state a claim upon which relief can be granted. The remaining claims, which are contract-based claims regarding liquidation preferences and dividend rights, are remanded to the district court for further proceedings.

## I. Background

### A. Statutory Framework

#### 1. The Origins of Fannie Mae and Freddie Mac

Created by federal statute in 1938, Fannie Mae originated as a government-owned entity designed to "provide stability in the secondary market for residential mortgages," to "increas[e] the liquidity of mortgage investments," and to "promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1716; *see id*. § 1717. To accomplish those goals, Fannie Mae (i) purchases mortgage loans from commercial banks, which frees up those lenders to make additional loans, (ii) finances those purchases by packaging the mortgage loans into mortgage-backed securities, and (iii) then sells those securities to investors. In 1968, Congress made Fannie Mae a publicly

traded, stockholder-owned corporation. *See* Housing and Urban Development Act, Pub. L. No. 90-448, § 801, 82 Stat. 476, 536 (1968) (codified at 12 U.S.C. § 1716b).

Congress created Freddie Mac in 1970 to "increase the availability of mortgage credit for the financing of urgently needed housing." Federal Home Loan Mortgage Corporation Act, Pub. L. No. 91-351, preamble, 84 Stat. 450 (1970). Much like Fannie Mae, Freddie Mac buys mortgage loans from a broad variety of lenders, bundles them together into mortgage-backed securities, and then sells those mortgage-backed securities to investors. In 1989, Freddie Mac became a publicly traded, stockholder-owned corporation. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 731, 103 Stat. 183, 429–436.

Fannie Mae and Freddie Mac became major players in the United States' housing market. Indeed, in the lead up to 2008, Fannie Mae's and Freddie Mac's mortgage portfolios had a combined value of $5 trillion and accounted for nearly half of the United States mortgage market. But in 2008, the United States economy fell into a severe recession, in large part due to a sharp decline in the national housing market. Fannie Mae and Freddie Mac suffered a precipitous drop in the value of their mortgage portfolios, pushing the Companies to the brink of default.

## 2. The 2008 Housing and Economic Recovery Act

Concerned that a default by Fannie and Freddie would imperil the already fragile national economy, Congress enacted the Recovery Act, which established FHFA and authorized it to undertake extraordinary economic measures to resuscitate the Companies. To begin with, the Recovery Act denominated Fannie and Freddie "regulated entit[ies]" subject to the direct "supervision" of FHFA, 12 U.S.C. § 4511(b)(1), and the

"general regulatory authority" of FHFA's Director, *id.* § 4511(b)(1), (2). The Recovery Act charged FHFA's Director with "oversee[ing] the prudential operations" of Fannie Mae and Freddie Mac and "ensur[ing] that" they "operate[] in a safe and sound manner," "consistent with the public interest." *Id.* § 4513(a)(1)(A), (B)(i), (B)(v).

The Recovery Act further authorized the Director of FHFA to appoint FHFA as either conservator or receiver for Fannie Mae and Freddie Mac "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs." 12 U.S.C. § 4617(a)(2). The Recovery Act invests FHFA as conservator with broad authority and discretion over the operation of Fannie Mae and Freddie Mac. For example, upon appointment as conservator, FHFA "shall * * * immediately succeed to * * * all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." *Id.* § 4617(b)(2)(A). In addition, FHFA "may * * * take over the assets of and operate the regulated entity," and "may * * * preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(B)(i), (iv).

The Recovery Act further invests FHFA with expansive "[g]eneral powers," explaining that FHFA "may," among other things, "take such action as may be * * * necessary to put the regulated entity in a sound and solvent condition" and "appropriate to carry on the business of the regulated entity and preserve and conserve [its] assets and property[.]" 12 U.S.C. § 4617(b)(2), (2)(D). FHFA's powers also include the discretion to "transfer or sell any asset or liability of the regulated entity in default * * * without any approval, assignment, or consent," *id*. § 4617(b)(2)(G), and to "disaffirm or repudiate [certain] contract[s] or lease[s]," *id*. § 4617(d)(1).

*See also id.* § 4617(b)(2)(H) (power to pay the regulated entity's obligations); *id.* § 4617(b)(2)(I) (investing the conservator with subpoena power).

Consistent with Congress's mandate that FHFA's Director protect the "public interest," 12 U.S.C. § 4513(a)(1)(B)(v), the Recovery Act invested FHFA as conservator with the authority to exercise its statutory authority and any "necessary" "incidental powers" in the manner that "the Agency [FHFA] determines is in the best interests of the regulated entity *or the Agency*." *Id.* § 4617(b)(2)(J) (emphasis added).

The Recovery Act separately granted the Treasury Department "temporary" authority to "purchase any obligations and other securities issued by" Fannie and Freddie. 12 U.S.C. §§ 1455(*l*)(1)(A), 1719. That provision made it possible for Treasury to buy large amounts of Fannie and Freddie stock, and thereby infuse them with massive amounts of capital to ensure their continued liquidity and stability.

Continuing Congress's concern for protecting the public interest, however, the Recovery Act conditioned such purchases on Treasury's specific determination that the terms of the purchase would "protect the taxpayer," 12 U.S.C. § 1719(g)(1)(B)(iii), and to that end specifically authorized "limitations on the payment of dividends," *id.* § 1719(g)(1)(C)(vi). A sunset provision terminated Treasury's authority to purchase such securities after December 31, 2009. *Id.* § 1719(g)(4). After that, Treasury was authorized only "to hold, exercise any rights received in connection with, or sell, any obligations or securities purchased." *Id.* § 1719(g)(2)(D).

Lastly, the Recovery Act sharply limits judicial review of FHFA's conservatorship activities, directing that "no court may take any action to restrain or affect the exercise of powers

or functions of the Agency as a conservator." 12 U.S.C. § 4617(f).

## B. Factual Background

On September 6, 2008, FHFA's Director placed both Fannie Mae and Freddie Mac into conservatorship. The next day, Treasury entered into Senior Preferred Stock Purchase Agreements ("Stock Agreements") with Fannie and Freddie, under which Treasury committed to promptly invest billions of dollars in Fannie and Freddie to keep them from defaulting. Fannie and Freddie had been "unable to access [private] capital markets" to shore up their financial condition, "and the only way they could [raise capital] was with Treasury support." *Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Fin. Servs.*, 110th Cong. 12 (2008) (Statement of James B. Lockhart III, Director, FHFA).

In exchange for that extraordinary capital infusion, Treasury received one million senior preferred shares in each company. Those shares entitled Treasury to: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved; (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment; (iii) quarterly dividends that the Companies could either pay at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%; (iv) warrants allowing Treasury to purchase up to 79.9% of Fannie's and Freddie's common stock;

and (v) the possibility of periodic commitment fees over and above any dividends.[1]

The Stock Agreements also included a variety of covenants. Of most relevance here, the Stock Agreements included a flat prohibition on Fannie and Freddie "declar[ing] or pay[ing] any dividend (preferred or otherwise) or mak[ing] any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof" without Treasury's advance consent (unless the dividend or distribution was for Treasury's Senior Preferred Stock or warrants). J.A. 2451.

The Stock Agreements initially capped Treasury's commitment to invest capital at $100 billion per company. It quickly became clear, however, that Fannie and Freddie were in a deeper financial quagmire than first anticipated. So their survival would require even greater capital infusions by Treasury, as sufficient private investors were still nowhere to be found. Consequently, FHFA and Treasury adopted the First Amendment to the Stock Agreements in May 2009, under which Treasury agreed to double the funding commitment to $200 billion for each company.

Seven months later, in a Second Amendment to the Stock Agreements, FHFA and Treasury again agreed to raise the cap, this time to an adjustable figure determined in part by the amount of Fannie's and Freddie's quarterly cumulative losses between 2010 and 2012. As of June 30, 2012, Fannie and Freddie together had drawn $187.5 billion from Treasury's funding commitment.

---

[1] Thus far, Treasury has not asked Fannie and Freddie to pay any commitment fees.

Through the first quarter of 2012, Fannie and Freddie repeatedly struggled to generate enough capital to pay the 10% dividend they owed to Treasury under the amended Stock Agreements.[2] FHFA and Treasury stated publicly that they worried about perpetuating the "circular practice of the Treasury advancing funds to [Fannie and Freddie] simply to pay dividends back to Treasury," and thereby increasing their debt loads in the process.[3]

Accordingly, FHFA and Treasury adopted the Third Amendment to the Stock Agreements on August 17, 2012. The Third Amendment to the Stock Agreements replaced the previous quarterly 10% dividend formula with a requirement that Fannie and Freddie pay as dividends only the amount, if any, by which their net worth for the quarter exceeded a capital buffer of $3 billion, with that buffer decreasing annually down to zero by 2018. In simple terms, the Third Amendment requires Fannie and Freddie to pay quarterly to Treasury a dividend equal to their net worth—however much or little that might be. Through that new dividend formula, Fannie and Freddie would never again incur more debt just to make their quarterly dividend payments, thereby precluding any dividend-driven downward debt spiral. But neither would Fannie or Freddie be able to accrue capital in good quarters.

Under the Third Amendment, Fannie Mae and Freddie Mac together paid Treasury $130 billion in dividends in 2013,

---

[2] Neither company drew upon Treasury's commitment in the second quarter of 2012 though.

[3] Press Release, United States Dep't of the Treasury, *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (August 17, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg 1684.aspx ("Treasury Press Release").

and another $40 billion in 2014. The next year, however, Fannie's and Freddie's quarterly net worth was far lower: Fannie paid Treasury $10.3 billion and Freddie paid Treasury $5.5 billion. *See* FANNIE MAE, FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2015 (Feb. 19, 2016); FREDDIE MAC, FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2015 (Feb. 18, 2016). By comparison, without the Third Amendment, Fannie and Freddie together would have had to pay Treasury $19 billion in 2015 or else draw once again on Treasury's commitment of funds and thereby increase Treasury's liquidation preference. In the first quarter of 2016, Fannie paid Treasury $2.9 billion and Freddie paid Treasury no dividend at all. *See* FANNIE MAE, FORM 10-Q FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2016 (May 5, 2016); FREDDIE MAC, FORM 10-Q FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2016 (May 3, 2016).

Under the Third Amendment, and FHFA's conservatorship, Fannie and Freddie have continued their operations for more than four years. During that time, Fannie and Freddie, among other things, collectively purchased at least 11 million mortgages on single-family owner-occupied properties, and Fannie issued over $1.5 trillion in single-family mortgage-backed securities.[4]

---

[4] *See* FANNIE MAE, FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2015 (Feb. 19, 2016); FREDDIE MAC, ANNUAL HOUSING ACTIVITIES REPORT FOR 2015, at 1 (March 15, 2016); FANNIE MAE, 2015 ANNUAL HOUSING ACTIVITIES REPORT AND ANNUAL MORTGAGE REPORT, tbl. 1A (March 14, 2016); FANNIE MAE, 2014 ANNUAL HOUSING ACTIVITIES REPORT AND ANNUAL MORTGAGE REPORT, tbl. 1A (March 13, 2015); FREDDIE MAC, ANNUAL HOUSING ACTIVITIES REPORT FOR 2014, at 1 (March 11, 2015); FANNIE MAE, 2013 ANNUAL HOUSING ACTIVITIES REPORT AND ANNUAL MORTGAGE REPORT, tbl. 1A (March 13, 2014);

13

## C.  Procedural History

In 2013, a number of Fannie Mae and Freddie Mac stockholders filed suit challenging the Third Amendment. Different groups of plaintiffs have pressed different claims. First, various hedge funds, mutual funds, and insurance companies (collectively, "institutional stockholders") argued that (i) FHFA's and Treasury's adoption of the Third Amendment exceeded their authority under the Recovery Act, and (ii) FHFA and Treasury each engaged in arbitrary and capricious conduct, in violation of the Administrative Procedure Act ("APA").  The institutional stockholders requested declaratory and injunctive relief, but no damages.[5]

Second, a class of stockholders ("class plaintiffs") and a few of the institutional stockholders alleged that, in adopting the Third Amendment, FHFA and the Companies breached the terms governing dividends, liquidation preferences, and voting rights in the stock certificates for Freddie's Common Stock and for both Fannie's and Freddie's Preferred Stock.  They further alleged that those defendants breached the implied covenants of good faith and fair dealing in those certificates.  The class plaintiffs also alleged that FHFA and Treasury breached state-law fiduciary duties owed by a corporation's management and

FREDDIE MAC, ANNUAL HOUSING ACTIVITIES REPORT FOR 2013, at 1 (March 12, 2014).

[5] One of the institutional stockholders—Arrowood—does not identify the claims for which it seeks damages in its prayer for relief. However, looking at the description of each claim, Arrowood alleges that it sustained damages only in its breach of contract and breach of implied covenant claims.  For the Recovery Act and APA claims, Arrowood alleges only that it is entitled to relief "under 5 U.S.C. §§ 702, 706(2)(C)," J.A. 208, provisions of the APA that do not authorize money damages.

controlling shareholder, respectively. Some of the institutional stockholders asserted similar claims against FHFA. The class plaintiffs asked the court to declare their lawsuit a "proper derivative action," J.A. 277, and to award damages as well as injunctive and declaratory relief.

The district court granted FHFA's and Treasury's motions to dismiss both complaints for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 246 (D.D.C. 2014). Specifically, the court dismissed the Recovery Act and APA claims as barred by the Recovery Act's express limitation on judicial review, 12 U.S.C. § 4617(f). The court dismissed the APA claims against Treasury on the same statutory ground, reasoning that Treasury's "interdependent, contractual conduct is directly connected to FHFA's activities as a conservator." *Id.* at 222. The district court explained that "enjoining Treasury from partaking in the Third Amendment would restrain FHFA's uncontested authority to determine how to conserve the viability of [Fannie and Freddie]." *Id.* at 222–223.

Turning to the class plaintiffs' claims for breach of fiduciary duty, the court dismissed those as barred by FHFA's statutory succession to all rights and interests held by Fannie's and Freddie's stockholders, 12 U.S.C. § 4617(b)(2)(A). The court then dismissed the breach of contract and breach of the implied covenant of good faith and fair dealing claims based on liquidation preferences as not ripe because Fannie and Freddie had not been liquidated. Finally, the district court dismissed the dividend-rights claims, reasoning that no such rights exist.[6]

---

[6] The class plaintiffs had also alleged that the failure of FHFA and Treasury to provide just compensation for taking private property violated the Takings Clause of the Fifth Amendment. The district

## II. Jurisdiction

Before delving into the merits, we pause to assure ourselves of our jurisdiction, as is our duty. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) ("On every writ of error or appeal, the first and fundamental question is that of jurisdiction[.]") (citation omitted). A provision of the Recovery Act deprives courts of jurisdiction "to affect, by injunction or otherwise, the issuance or effectiveness of any classification or action of the Director under this subchapter * * * or to review, modify, suspend, terminate, or set aside such classification or action." 12 U.S.C. § 4623(d).

That language does not strip this court of jurisdiction to hear this case. By its terms, Section 4623(d) applies only to "any classification or action of the Director." 12 U.S.C. § 4623(d). Thus, Section 4623(d) prohibits review of the Director's establishment of "risk-based capital requirements * * * to ensure that the enterprises operate in a safe and sound manner, maintaining sufficient capital and reserves to support the risks that arise in the operations and management of the enterprises." *Id.* § 4611(a)(1). In particular, Section 4614 requires "the Director" to "classify" Fannie and Freddie as "adequately capitalized," "undercapitalized," "significantly undercapitalized," or "critically undercapitalized." *Id.* § 4614(a). Classification as undercapitalized or significantly undercapitalized in turn subjects Fannie and Freddie to a host of supervisory actions by "the Director." *See id.* §§ 4615–4616. It is those capital-

---

court dismissed that challenge for failure to state a legally cognizable claim, Fed. R. Civ. P. 12(b)(6), and the class plaintiffs have not challenged that ruling on appeal.

classification decisions that Section 4623(d) insulates from judicial review.

The Third Amendment was not a "classification or action of the Director" of FHFA. Rather, it was an action taken by FHFA acting as Fannie's and Freddie's conservator. Judicial review of the actions of the agency as *conservator* is addressed by Section 4617(f), not by Section 4623(d)'s particular focus on the Director's own actions. *Compare* 12 U.S.C. § 4617(f) (referencing "powers or functions of *the Agency*") (emphasis added), *with id.* § 4623(d) (referencing "any classification or action of *the Director*") (emphasis added).

FHFA argues that the Director's decision in 2008 to suspend capital classifications of Fannie Mae and Freddie Mac during the conservatorship could be a "classification or action of the Director." FHFA Suppl. Br. at 6–8 (quoting 12 U.S.C. § 4623(d)). Perhaps. But those are not the actions that the institutional stockholders and the class plaintiffs challenge. Instead, they challenge FHFA's decision as conservator to agree to changes in the Stock Agreement and to how Fannie and Freddie will compensate Treasury for its extensive past and promised future infusions of needed capital. Those actions do not fall within Section 4623(d)'s jurisdictional bar for Director-specific actions.

### III. Statutory Challenges to the Third Amendment

Turning to the merits, we address first the institutional stockholders' claims that FHFA's and Treasury's adoption of the Third Amendment violated both the Recovery Act and the APA. Both of those statutory claims founder on the Recovery Act's far-reaching limitation on judicial review. Congress was explicit in Section 4617(f) that "no court" can take "any action" that would "restrain or affect" FHFA's exercise of its "powers or functions * * * as a conservator or a receiver." 12 U.S.C. § 4617(f). We take that law at its word, and affirm dismissal of the institutional stockholders' claims for injunctive and declaratory relief designed to unravel FHFA's adoption of the Third Amendment.

### A. Section 4617(f) Bars the Challenges to FHFA Based on the Recovery Act

#### 1. Section 4617(f)'s Textual Barrier to Plaintiffs' Claims for Relief

The institutional stockholders' complaints ask the district court to declare the Third Amendment invalid, to vacate the Third Amendment, and to enjoin FHFA from implementing it. Those prayers for relief fall squarely within Section 4617(f)'s plain textual compass. The institutional stockholders seek to "restrain [and] affect" FHFA's "exercise of powers" "as a conservator" in amending the terms of Fannie's and Freddie's contractual funding agreement with Treasury to guarantee the Companies' continued access to taxpayer-financed capital without risk of incurring new debt just to pay dividends to Treasury. Such management of Fannie's and Freddie's assets, debt load, and contractual dividend obligations during their ongoing business operation sits at the core of FHFA's conservatorship function.

This court has interpreted a nearly identical statutory limitation on judicial review to prohibit claims for declaratory, injunctive, and other forms of equitable relief as long as the agency is acting within its statutory conservatorship authority. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, governs the Federal Deposit Insurance Corporation ("FDIC") when it serves as a conservator or receiver for troubled financial institutions. Section 1821(j) of that Act prohibits courts from "tak[ing] any action * * * to restrain or affect the exercise of powers or functions of [the FDIC] as a conservator or a receiver." 12 U.S.C. § 1821(j).

In multiple decisions, we have held that Section 1821(j) shields from a court's declaratory and other equitable powers a broad swath of the FDIC's conduct as conservator or receiver when exercising its statutory authority. To start with, in *National Trust for Historic Preservation in the United States v. FDIC* (*National Trust I*), 995 F.2d 238 (D.C. Cir. 1993) (per curiam), *aff'd in relevant part*, 21 F.3d 469 (D.C. Cir. 1994), we held that Section 1821(j) "bars the [plaintiff's] suit for injunctive relief" seeking to halt the sale of a building as violating the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* (repealed December 19, 2014). *See* 995 F.2d at 239. We explained that, because "the powers and functions the FDIC is exercising are, by statute, deemed to be those of a receiver," an injunction against the sale "would surely 'restrain or affect' the FDIC's exercise of those powers or functions." *Id.* Given Section 1821(j)'s "strong language," we continued, it would be "[im]possible * * * to interpret the FDIC's 'powers' and 'authorities' to include the limitation that those powers be subject to—and hence enjoinable for non-compliance with—any and all other federal laws." *Id.* at 240. Indeed, "given the breadth of the statutory language," Section 1821(j) "would appear to bar a court from acting"

notwithstanding a "parade of possible violations of existing laws." *National Trust for Historic Preservation in the United States v. FDIC* (*National Trust II*), 21 F.3d 469, 472 (D.C. Cir. 1994) (per curiam) (Wald, J., joined by Silberman, J., concurring).

Again in *Freeman v. FDIC*, 56 F.3d 1394 (D.C. Cir. 1995), this court rejected the plaintiffs' attempt to enjoin the FDIC, as receiver of a bank, from foreclosing on their home, *id.* at 1396. We acknowledged that Section 1821(j)'s stringent limitation on judicial review "may appear drastic," but that "it fully accords with the intent of Congress at the time it enacted FIRREA in the midst of the savings and loan insolvency crisis to enable the FDIC" to act "expeditiously" in its role as conservator or receiver. *Id.* at 1398. Given those exigent financial circumstances, "Section 1821(j) does indeed effect a sweeping ouster of courts' power to grant equitable remedies[.]" *Id.* at 1399; *see also MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 247 (D.C. Cir. 2013) (In Section 1821(j), "Congress placed 'drastic' restrictions on a court's ability to institute equitable remedies[.]") (quoting *Freeman*, 56 F.3d at 1398).

The rationale of those decisions applies with equal force to Section 4617(f)'s indistinguishable operative language. The plain statutory text draws a sharp line in the sand against litigative interference—through judicial injunctions, declaratory judgments, or other equitable relief—with FHFA's statutorily permitted actions as conservator or receiver. And, as with FIRREA, Congress adopted Section 4617(f) to protect FHFA as it addressed a critical aspect of one of the greatest financial crises in the Nation's modern history.

## 2. FHFA's Actions Fall Within its Statutory Authority

The institutional stockholders cite language in *National Trust I*, which states that FIRREA's—and by analogy the Recovery Act's—prohibition on injunctive and declaratory relief would not apply if the agency "has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions," *National Trust I*, 995 F.2d at 240. They then argue that FHFA's adoption of the Third Amendment was out of bounds because, in their view, the Recovery Act "*requires* FHFA as conservator to act independently to conserve and preserve the Companies' assets, to put the Companies in a sound and solvent condition, and to rehabilitate them." Institutional Pls. Br. at 26 (emphasis added). As the institutional stockholders see it, by committing Fannie's and Freddie's quarterly net worth—if any—to Treasury in exchange for continued access to Treasury's taxpayer-funded financial lifelines, FHFA acted like a *de facto* receiver functionally liquidating Fannie's and Freddie's businesses. And FHFA did so, they add, without following the procedural preconditions that the Recovery Act imposes on a receivership, such as publishing notice and providing an alternative dispute resolution process to resolve liquidation claims, *see* 12 U.S.C. § 4617(b)(3)(B)(i), (b)(7)(A)(i).[7]

That exception to the bar on judicial review has no application here because adoption of the Third Amendment falls within FHFA's statutory conservatorship powers, for four reasons.

---

[7] The institutional stockholders do not argue that FHFA or Treasury transgressed constitutional bounds in any respect.

**(i)** The Recovery Act endows FHFA with extraordinarily broad flexibility to carry out its role as conservator. Upon appointment as conservator, FHFA "immediately succeed[ed] to * * * all rights, titles, powers, and privileges" not only of Fannie Mae and Freddie Mac, but also "of any stockholder, officer, or director of such regulated entit[ies] with respect to the regulated entit[ies] and the assets of the regulated entit[ies.]" 12 U.S.C. § 4617(b)(2)(A)(i). In addition, among FHFA's many "[g]eneral powers" is its authority to "[o]perate the regulated entity," pursuant to which FHFA "*may*, as conservator or receiver * * * take over the assets of and operate * * * and conduct all business of the regulated entity; * * * collect all obligations and money due the regulated entity; * * * perform all functions of the regulated entity * * * ; preserve and conserve the assets and property of the regulated entity; and * * * provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver." *Id.* § 4617(b)(2), (2)(B) (emphasis added). The Recovery Act further provides that FHFA "*may*, as conservator, take such action as may be * * * necessary to put the regulated entity in a sound and solvent condition; and * * * appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." *Id.* § 4617(b)(2)(D) (emphasis added). FHFA also "*may* disaffirm or repudiate [certain] contract[s] or lease[s]." *Id*. § 4617(d)(1) (emphasis added); *see also id.* § 4617(b)(2)(G) (providing that FHFA "*may*, as conservator or receiver, transfer or sell any asset or liability of the regulated entity in default" without consent) (emphasis added).

Accordingly, time and again, the Act outlines what FHFA as conservator "may" do and what actions it "may" take. The statute is thus framed in terms of expansive grants of permissive, discretionary authority for FHFA to exercise as the

"Agency determines is in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J). "It should go without saying that 'may means may.'" *United States Sugar Corp. v. EPA*, 830 F.3d 579, 608 (D.C. Cir. 2016) (quoting *McCreary v. Offner*, 172 F.3d 76, 83 (D.C. Cir. 1999)). And "may" is, of course, "permissive rather than obligatory." *Baptist Memorial Hosp. v. Sebelius*, 603 F.3d 57, 63 (D.C. Cir. 2010).

Entirely absent from the Recovery Act's text is any mandate, command, or directive to build up capital for the financial benefit of the Companies' stockholders. That is noteworthy because, when Congress wanted to compel FHFA to take specific measures as conservator or receiver, it switched to language of command, employing "shall" rather than "may." *Compare* 12 U.S.C. § 4617(b)(2)(B) (listing actions that FHFA "may" take "as conservator or receiver" to "[o]perate the regulated entity"), *and id.* § 4617(b)(2)(D) (specifying actions that FHFA "may, as conservator" take), *with id.* § 4617(b)(2)(E) (specifying actions that FHFA "shall" take when "acting as receiver"), *and id.* § 4617(b)(14)(A) (specifying that FHFA as conservator or receiver "shall * * * maintain a full accounting"). "[W]hen a statute uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory." *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

In short, the most natural reading of the Recovery Act is that it permits FHFA, but does not compel it in any judicially enforceable sense, to preserve and conserve Fannie's and Freddie's assets and to return the Companies to private operation. And, more to the point, the Act imposes no precise order in which FHFA must exercise its multi-faceted conservatorship powers.

FHFA's execution of the Third Amendment falls squarely within its statutory authority to "[o]perate the [Companies]," 12 U.S.C. § 4617(b)(2)(B); to "reorganiz[e]" their affairs, *id.* § 4617(a)(2); and to "take such action as may be * * * appropriate to carry on the[ir] business," *id.* § 4617(b)(2)(D)(ii). Renegotiating dividend agreements, managing heavy debt and other financial obligations, and ensuring ongoing access to vital yet hard-to-come-by capital are quintessential conservatorship tasks designed to keep the Companies operational. The institutional stockholders no doubt disagree about the necessity and fiscal wisdom of the Third Amendment. But Congress could not have been clearer about leaving those hard operational calls to FHFA's managerial judgment.

That, indeed, is why Congress provided that, in exercising its statutory authority, FHFA "may" "take any action * * * which *the Agency determines* is in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J) (emphasis added). Notably, while FIRREA explicitly permits FDIC to factor the best interests of depositors into its conservatorship judgments, *id.* § 1821(d)(2)(J)(ii), the Recovery Act refers only to the best interests of FHFA and the Companies—and *not* those of the Companies' shareholders or creditors. Congress, consistent with its concern to protect the public interest, thus made a deliberate choice in the Recovery Act to permit FHFA to act in its own best governmental interests, which may include the taxpaying public's interest.

The dissenting opinion (at 8) views Sections 4617(b)(2)(D) and (E) as "mark[ing] the bounds of FHFA's conservator or receiver powers." Not so. As a plain textual matter, the Recovery Act expressly provides FHFA many "[g]eneral powers" "as conservator or receiver," 12 U.S.C. § 4617(b)(2), that are not delineated in Section 4617(b)(2)(D)

or (E). *See id.* § 4617(b)(2)(A) (assuming "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity"); *id.* § 4617(b)(2)(B) (power to "[o]perate the regulated entity"); *id.* § 4617(b)(2)(C) (power to "provide for the exercise of any function by any stockholder, director, or officer of any regulated entity"); *id.* § 4617(b)(2)(G) (power to "transfer or sell any asset or liability of the regulated entity in default"); *id.* § 4617(b)(2)(H) (power to "pay [certain] valid obligations of the regulated entity"); *id.* § 4617(b)(2)(I) (power to issue subpoenas and take testimony under oath). *See also id.* § 4617(d)(1) (granting FHFA as the conservator or receiver the power to "repudiate [certain] contract[s] or lease[s]").

The institutional stockholders also argue that, because Section 4617(b)(2)(D) describes FHFA's "[p]owers as conservator" by providing that FHFA "may * * * take such action as may be" "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to * * * preserve and conserve [their] assets," FHFA may act only when those two conditions are satisfied. Institutional Pls. Reply Br. at 13. In their view, FHFA "does not have other powers as conservator." *Id*.

The short answer is that the Recovery Act says nothing like that. It contains no such language of precondition or mandate. Indeed, if that is what Congress meant, it would have said FHFA "may only" act as necessary or appropriate to those tasks. Not only is that language missing from the Recovery Act, but Congress did not even say that FHFA "should"—let alone, "should first"—preserve and conserve assets or "should" first put the Companies in a sound and solvent condition. Nor did it articulate FHFA's power directly in terms of asset preservation or sound and solvent company operations. What

the statute says is that FHFA "*may * * ** take such action as *may* be" "necessary to put the [Companies] in a sound and solvent condition" and "*may* be" "appropriate to * * * preserve or conserve [the Companies'] assets." 12 U.S.C. § 4617(b)(2)(D) (emphases added). So at most, the Recovery Act empowers FHFA to "take such action" as may be necessary or appropriate to fulfill several goals. That is how Congress wrote the law, and that is the law we must apply. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–462 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–254 (1992)); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("[I]t is this court's obligation to enforce statutes as Congress wrote them.").[8]

**(ii)** Even if the Recovery Act did impose a primary duty to preserve and conserve assets, nothing in the Recovery Act says that FHFA must do that in a manner that returns them to their prior private, capital-accumulating, and dividend-paying condition for all stockholders. *See* Institutional Pls. Br. at 44. Tellingly, the institutional stockholders and dissenting opinion accept that the original Stock Agreements and the First and Second Amendments fit comfortably within FHFA's statutory authority as conservator. *See* Dissenting Op. at 21 (acknowledging that FHFA "manage[d] the Companies within

---

[8] The dissenting opinion suggests that Congress's use of permissive "may" terminology is "a simple concession to the practical reality that a conservator may not always succeed in rehabilitating its ward." Dissenting Op. at 9 n.1. Not so. Even with the hypothesized addition of mandatory terms to the statute, the Act would at most command FHFA to take actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to * * * preserve and conserve [their] assets." 12 U.S.C. § 4617(b)(2)(D). FHFA's compliance thus would turn on its actions, not on their outcome.

the conservator role" until "the tide turned * * * with the Third Amendment"). But the Stock Agreements and First and Second Amendments themselves both obligated the Companies to pay large dividends to Treasury and prohibited them, without Treasury's approval, from "declar[ing] or pay[ing] any dividend (preferred or otherwise) or mak[ing] any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof." *E.g.*, J.A. 2451; *cf.* 12 U.S.C. § 1719(g)(1)(C)(vi) ("To protect the taxpayers, the Secretary of the Treasury shall take into consideration," *inter alia*, "[r]estrictions on the use of corporation resources, including limitations on the payment of dividends[.]").

That means that FHFA's ability as conservator to give Treasury (and, by extension, the taxpayers) a preferential right to dividends, to the effective exclusion of other stockholders, was already put in place by the unchallenged and thus presumptively proper Stock Agreements and Amendments that predated the Third Amendment. The Third Amendment just locked in an exclusive allocation of dividends to Treasury that was already made possible by—and had been in practice under—the previous agreements, in exchange for continuing the Companies' unprecedented access to guaranteed capital.

The institutional stockholders point to Section 4617(a)(2) as a purported source of FHFA's mandatory duty to return the Companies to their old financial ways. But that Section provides only that FHFA's Director has the power to appoint FHFA as "conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity." 12 U.S.C. § 4617(a)(2). It is then the multi-paged remaining portion of Section 4617 that details at substantial length FHFA's many "[g]eneral powers" as conservator or receiver. *Id.* § 4617(b)(2).

Furthermore, that explicit power to "reorganiz[e]" supports FHFA's action because the Third Amendment reorganized the Companies' financial operations in a manner that ensures that quarterly dividend obligations are met without drawing upon Treasury's commitment and thereby increasing Treasury's liquidation preference. FHFA's textual authority to reorganize and rehabilitate the Companies, in other words, forecloses any argument that the Recovery Act made the *status quo ante* a statutorily compelled end game.

In addition, the Recovery Act openly recognizes that sometimes conservatorship will involve managing the regulated entity in the lead up to the appointment of a liquidating receiver. *See* 12 U.S.C. § 4617(a)(4)(D) (providing that appointment of FHFA as a receiver automatically terminates a conservatorship under the Act). The authority accorded FHFA as a conservator to reorganize or rehabilitate the affairs of a regulated entity thus must include taking measures to prepare a company for a variety of financial scenarios, including possible liquidation. Contrary to the dissenting opinion (at 11), that does not make FHFA a "hybrid" conservator-receiver. It makes FHFA a fully armed conservator empowered to address all potential aspects of the Companies' financial condition and operations at all stages when confronting a threatened business collapse of truly unprecedented magnitude and with national economic repercussions.

The institutional stockholders nonetheless argue that, rather than adopt the Third Amendment's dividend allocation, FHFA could instead have adopted a payment-in-kind dividend option that would have increased Treasury's liquidation preference by 12% in return for avoiding a 10% dividend payment. Perhaps. But the Recovery Act does not compel that choice over the variable dividend to Treasury put in place by

the Third Amendment. Either way, Section 4617(f) flatly forbids declaratory and injunctive relief aimed at superintending to that degree FHFA's conservatorship or receivership judgments.[9]

The dissenting opinion claims that the Third Amendment's prevention of capital accumulation went too far because it constitutes a "*de facto* receiver[ship]" or "*de facto* liquidation," and thus could not possibly constitute a permissible "conservator" measure. *See* Dissenting Op. at 10, 17, 25. That position presumes the existence of a rigid boundary between the conservator and receiver roles that even the dissenting opinion seems to admit may not exist. *See* Dissenting Op. at 7 (acknowledging that "the line between a conservator and a receiver may not be completely impermeable"). Wherever that line may be, it is not crossed just because an agreement that ensures continued access to vital capital diverts all dividends to the lender, who had singlehandedly saved the Companies from collapse, even if the dividend payments under that agreement may at times be greater than the dividend payments under

---

[9] The institutional stockholders also contend that FHFA's adoption of the Third Amendment violated Section 4617(a)(7), which provides that FHFA "shall not be subject to the direction or supervision of any other agency." 12 U.S.C. § 4617(a)(7). The institutional stockholders pleaded, however, only that "on information and belief, FHFA agreed to the [Third Amendment] * * * at the insistence and under the direction and supervision of Treasury." J.A. 122, ¶ 70. On a motion to dismiss for failure to state a claim, we are not required to credit a bald legal conclusion that is devoid of factual allegations and that simply parrots the terms of the statute. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (citations, internal quotation marks, and alterations omitted).

previous agreements. The proof that no *de facto* liquidation occurred is in the pudding: non-capital-accumulating entities that continue to operate long-term, purchasing more than 11 million mortgages and issuing more than $1.5 trillion in single-family mortgage-backed securities over four years, are not the same thing as liquidating entities.

The argument also overlooks that the Third Amendment's redirection of dividends to Treasury came in exchange for a promise of continued access to necessary capital free of the preexisting risk of accumulating more debt simply to pay dividends to Treasury. Now, after more than eight years of conservatorship—four of which have been under the Third Amendment—Fannie and Freddie have gone from a state of near-collapse to fluctuating levels of profitability. FHFA thus has "carr[ied] on the business of" Fannie and Freddie, 12 U.S.C. § 4617(b)(2)(D)(ii), in that they remain fully operational entities with combined operating assets of $5 trillion, *see* Treasury Resp. Br. at 35. While the dissenting opinion worries that the Companies have "no hope of survival past 2018," Dissenting Op. at 27, the Third Amendment allows the Companies after 2018 to draw upon Treasury's remaining funding commitment if needed to remedy any negative net worth.[10]

**(iii)** The institutional stockholders argue that the Third Amendment violated FHFA's "fiduciary and statutory obligations to * * * rehabilitate [the Companies] to normal

---

[10] The dissenting opinion comments that the dividend payments under the Third Amendment did not go towards paying off what the Companies borrowed from Treasury. *See* Dissenting Op. at 21, 23. Yet the Stock Agreements and the First and Second Amendments, which the dissenting opinion acknowledges were lawful, *id.* at 21, similarly did not provide for the Companies' dividends to pay down Treasury's liquidation preference.

business operations," Institutional Pls. Br. at 34, because the Amendment was as a factual matter not needed to prevent further indebtedness, and was instead intended to secure a windfall for Treasury (and indirectly taxpayers) at the expense of the stockholders. They likewise contend that FHFA's motivation for adopting the Third Amendment all along has been to liquidate the Companies. They rest those arguments on factual allegations that FHFA and Treasury knew Fannie and Freddie had just turned an economic corner, and had experienced substantial increases in their net worth. In that regard, the institutional stockholders cite evidence that FHFA and Treasury were aware before they adopted the Third Amendment that Fannie and Freddie might each experience a substantial one-time increase in net worth in 2013 and 2014 due to the realization of certain deferred tax assets. They also point to presentations Fannie Mae made to FHFA and Treasury in July and August before the Third Amendment was executed, predicting that Fannie Mae and Freddie Mac would need only small draws from Treasury's commitment (totaling less than $9 billion) to pay Treasury its dividend through the year 2022. In the institutional stockholders' view, FHFA's alleged knowledge that rosier days were dawning shows that FHFA had no legitimate conservatorship reason to adopt the Third Amendment rather than to pursue measures that would allow the Companies to accumulate capital and return to the dividend-paying *status quo ante*.

To be clear, though, the institutional stockholders argue that the Third Amendment would be just as flawed in their view even if Fannie and Freddie had made *no* profits, were badly hemorrhaging money in 2013 and 2014, and thus were in dire need of the Third Amendment's promise of continued access to capital, free from dividend obligations that would have increased still further Treasury's liquidation preference. *See* Oral Arg. Tr. 22–24 (Q: "[D]oes the argument that they were

not acting as a proper conservator depend on the fact that they were in fact profitable? A: "[N]o, it doesn't.").[11]

Treasury argues, by contrast, that FHFA was taking a broader and longer-term view of the Companies' financial condition. In almost every quarter before the Third Amendment was adopted, Fannie and Freddie had been unable to make their dividend payments to Treasury without taking on more debt to Treasury. In SEC filings, Fannie and Freddie themselves predicted that they would be unable to pay the 10% dividend over the long term. *See, e.g.*, J.A. 1983 (Fannie Mae statement that it "do[es] not expect to generate net income or comprehensive income in excess of [its] annual dividend obligation to Treasury over the long term[,]" so its "dividend obligation to Treasury will increasingly drive [its] future draws under the senior [Stock Agreement]"); *id.* at 2160 (similar for Freddie Mac). Other market participants shared that view. *See, e.g.*, *id.* at 655 (Moody's report).

According to Treasury, the Third Amendment put a structural end to "the circular practice of the Treasury advancing funds to [Fannie and Freddie] simply to pay dividends back to Treasury." Treasury Press Release, *supra*. Said another way, the Third Amendment changed the dividend formula to require Fannie and Freddie to pay whatever dividend they could afford—however little, however much—to prevent them from ever again having to fruitlessly borrow

---

[11] After the large dividends in 2013 and 2014, Fannie and Freddie made a far smaller dividend payment—a combined $15.8 billion—in 2015. In the first quarter of 2016, Freddie Mac had a comprehensive loss of $200 million and paid no dividend at all. *See* FREDDIE MAC, FORM 10-Q FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2016 (May 3, 2016). That loss was due to market forces such as interest-rate volatility and widening spreads between interest rates and benchmark rates. *Id.* at 1–2.

from Treasury to pay Treasury. If Fannie and Freddie made profits, Treasury would reap the rewards; if they suffered losses, Treasury would have to forgo payment entirely.

The problem with the institutional stockholders' argument is that the factual question of whether FHFA adopted the Third Amendment to arrest a "debt spiral" or whether it was intended to be a step in furthering the Companies' return to "normal business operations" is not dispositive of FHFA's authority to adopt the Third Amendment. Nothing in the Recovery Act confines FHFA's conservatorship judgments to those measures that are driven by financial necessity. And for purposes of applying Section 4617(f)'s strict limitation on judicial relief, allegations of motive are neither here nor there, as the dissenting opinion agrees (at 20). The stockholders cite nothing—nor can we find anything—in the Recovery Act that hinges FHFA's exercise of its conservatorship discretion on particular motivations. *See Leon County, Fla. v. FHFA*, 816 F. Supp. 2d 1205, 1208 (N.D. Fla. 2011) ("Congress barred judicial review of the conservator's actions without making an exception for actions said to be taken from an improper motive.").

Likewise, the duty that the Recovery Act imposes on FHFA to comply with receivership procedural protections textually turns on FHFA actually liquidating the Companies. *See, e.g.*, 12 U.S.C. § 4617(b)(3)(B) ("The receiver, in any case involving the liquidation or winding up of the affairs of [Fannie or Freddie], shall * * * promptly publish a notice to the creditors of the regulated entity to present their claims, together with proof, to the receiver[.]"). Undertaking permissible conservatorship measures even with a receivership mind would not be out of statutory bounds.

The institutional stockholders' burden instead is to show that FHFA's actions were frolicking outside of statutory limits as a matter of law. What matters then is the substantive measures that FHFA took, and nothing in the Recovery Act mandated that FHFA take steps to return Fannie Mae and Freddie Mac at the first sign of financial improvement to the old economic model that got them into so much trouble in the first place. Nor did anything in the Recovery Act forbid FHFA from adopting measures that took a more comprehensive, wait-and-see view of the Companies' long-term financial condition, or simply kept the Companies' heads above water while FHFA observed their economic performance over time and through ever-changing market conditions. *See*, *e.g.*, *supra* note 11.[12]

**(iv)** The institutional stockholders cite state-law and historical sources to suggest that FHFA was not acting as a common-law conservator normally would when it adopted the Third Amendment. *See* Institutional Pls. Br. at 29–33. The problem for the plaintiffs is that arguments about the contours of common-law conservatorship do nothing to show that FHFA exceeded *statutory* bounds, which is what *National Trust I* referenced. Under the Recovery Act, FHFA as conservator may "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity *or the Agency*." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added). That explicit statutory authority to take

---

[12] We grant the plaintiffs' various motions to supplement the record with evidence of what FHFA and Treasury officials knew about the Companies' predicted financial performance and when. That evidence does not affect our analysis, and we see no need to remand the claims for the district court to consider a fuller administrative record because the Recovery Act simply does not impose upon FHFA the precise duties that the institutional plaintiffs' factual arguments suppose.

conservatorship actions in the conservator's own interest, which here includes the public and governmental interests, directly undermines the dissenting opinion's supposition that Congress intended FHFA to be nothing more than a common-law conservator. *See* Dissenting Op. at 16 (asserting that, in the common-law probate context, a conservator is generally "forbid[den] * * * from acting for the benefit of the conservator himself or a third party").

On top of that, Congress in the Recovery Act gave FHFA the ability to obtain from Treasury capital infusions of unprecedented proportions, as long as the deal FHFA struck with Treasury "protect[ed] the taxpayer" and "provide[d] stability to the financial markets." 12 U.S.C. §§ 1455, 1719(g)(1)(B)(i), (iii). That $200 billion-plus lifeline is what saved the Companies—none of the institutional stockholders were willing to infuse that kind of capital during desperate economic times—and bears no resemblance to the type of conservatorship measures that a private common-law conservator would be able to undertake. Indeed, the dissenting opinion acknowledges that FHFA "operating as a conservator may act in its own interests to protect both the Companies and the taxpayers from whom [FHFA] was ultimately forced to borrow[.]" Dissenting Op. at 19. To paraphrase the dissenting opinion (at 27), Congress made clear in the Recovery Act that FHFA is not your grandparents' conservator. For good reason.

The dissenting opinion asserts that our reading of Section 4617(b)(2)(J)(ii) effectively "forecloses *any* opportunity for meaningful judicial review of FHFA's actions," Dissenting Op. at 18, and decries the abandonment of the "rule of law," *see id.* at 2. That is quite surprising to hear. As the balance of our opinion makes clear—much of which the dissenting opinion joins—the Recovery Act only limits judicial *remedies* (banning injunctive, declaratory, and other equitable relief) after a court

determines that the actions taken fall within the scope of statutory authority. The Act does not prevent either constitutional claims (none are raised here) or judicial review through cognizable actions for damages like breach of contract.

The dissenting opinion also argues that the court's holding is inconsistent with Congress's provision of judicial review for FHFA's actions in Section 4617(a)(5). Dissenting Op. at 18. But Section 4617(a)(5) permits judicial review *only* at the behest of a regulated entity itself and even then *only* of the Director's decision to appoint FHFA as a conservator or receiver.[13] That narrow focus of the provision is underscored by the requirement that the lawsuit must be promptly filed within thirty days of the appointment decision (a deadline that none of the plaintiffs here met). We thus beg to differ with the dissenting opinion's claim (at 18, 22) that Section 4617(a)(5) provides more intrusive judicial review for actions FHFA takes when acting as a receiver, many of which would presumably occur outside of that thirty-day filing window. *Cf. James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092–1094

---

[13] Section 4617(a)(5) provides in full:

(A) In general
   If the Agency is appointed conservator or receiver under this section, the regulated entity may, within 30 days of such appointment, bring an action in the United States district court for the judicial district in which the home office of such regulated entity is located, or in the United States District Court for the District of Columbia, for an order requiring the Agency to remove itself as conservator or receiver.
(B) Review
   Upon the filing of an action under subparagraph (A), the court shall, upon the merits, dismiss such action or direct the Agency to remove itself as such conservator or receiver.

12 U.S.C. § 4617(a)(5).

(D.C. Cir. 1996) (distinguishing between provisions in FIRREA for judicial review of the appointment of FDIC as conservator or receiver and those governing judicial review of the FDIC's exercise of its powers as conservator or receiver). Nothing in our reading of Section 4617(b)(2)(J)(ii), which governs what decisions a properly appointed conservator or receiver makes, undermines the sharply cabined opportunity for early-stage judicial review of the appointment decision itself.

\* \* \* \* \*

In short, for all of their arguments that FHFA has exceeded the bounds of conservatorship, the institutional stockholders have no textual hook on which to hang their hats. Indeed, they do not dispute that FHFA had the authority as conservator to enter the Companies into the Stock Agreements with Treasury to raise vitally needed capital, to agree to pay dividends to Treasury on the stocks sold as part of that capital-raising bargain, to foreclose dividend payments to private stockholders in that process, *cf.* 12 U.S.C. § 1719(g)(1)(C)(vi), or to amend the terms of the Stock Agreements. The dissenting opinion even admits that FHFA's actions prior to the Third Amendment—which include the debt-inducing dividends paid under the First and Second Amendments as well as the original Stock Agreements—were "within the conservator role." *See* Dissenting Op. at 21.

What the institutional stockholders and dissenting opinion take issue with, then, is the allocated amount of dividends that FHFA negotiated to pay its financial-lifeline stockholder—Treasury—to the exclusion of other stockholders, and that decision's feared impact on business operations in the future. But Section 4617(f) prohibits us from wielding our equitable relief to second-guess either the dividend-allocating terms that

FHFA negotiated on behalf of the Companies, or FHFA's business judgment that the Third Amendment better balances the interests of all parties involved, including the taxpaying public, than earlier approaches had. *See County of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013) ("[I]t is not our place to substitute our judgment for FHFA's[.]"). Because the Third Amendment falls within FHFA's broad conservatorship authority under the Recovery Act, we must enforce Section 4617(f)'s explicit prohibition on the equitable relief that the institutional stockholders seek.

## B. Section 4617(f) Bars the Challenges to FHFA's Compliance with the APA

The institutional stockholders also claim that FHFA's adoption of the Third Amendment amounted to arbitrary and capricious agency action in violation of the APA. That argument cannot surmount Section 4617(f)'s barrier to equitable relief—the only form of relief statutorily authorized for an APA violation. *See* 5 U.S.C. § 702 (allowing "action in a court * * * seeking relief other than money damages"); *Cohen v. United States*, 650 F.3d 717, 723 (D.C. Cir. 2011) (en banc). Indeed, Section 4617(f)'s strict limitation on judicial review would be an empty promise if it evaporated upon the assertion that FHFA's actions ran afoul of some other statute.

We accordingly "do not think it possible, in light of the strong language of" Section 4617(f) to read the Recovery Act's grant of "'powers' and 'authorities' to include the limitation that those powers be subject to—and hence enjoinable for non-compliance with—any and all other federal laws." *See National Trust I*, 995 F.2d at 240. Just as we cannot second-guess FHFA's conservatorship decisions under the Recovery Act, we cannot quarterback those actions under the APA either.

### C.  Section 4617(f) Bars the Challenges to Treasury's Compliance with the Recovery Act and the APA

Lastly, the institutional stockholders argue that declaratory and injunctive relief should be available against Treasury because its own actions in signing on to the Third Amendment both violated the Recovery Act and were arbitrary and capricious in violation of the APA.  Those claims fall within Section 4617(f)'s sweep as well.

To be sure, Section 4617(f) most explicitly bars judicial relief against FHFA, and not Treasury.  But Section 4617(f) also forecloses judicial relief that would "affect" the exercise of FHFA's "powers or functions" as conservator or receiver. 12 U.S.C. § 4617(f).  An action "can 'affect' the exercise of powers by an agency without being aimed directly at [that agency]."  *Hindes v. FDIC*, 137 F.3d 148, 160 (3d Cir. 1998); *see also Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir. 1992) (Enjoining a third party "would have the same effect, from the FDIC's perspective, as directly enjoining the FDIC[.]").

In this case, the effect of any injunction or declaratory judgment aimed at Treasury's adoption of the Third Amendment would have just as direct and immediate an effect as if the injunction operated directly on FHFA.  After all, it takes (at least) two to contract, and the Companies, under FHFA's conservatorship, are just as much parties to the Third Amendment as Treasury.  One side of the agreement cannot exist without the other.

Accordingly, Section 4617(f)'s prohibition on relief that "affect[s]" FHFA applies here because the requested injunction's operation would have exactly the same force and effect as enjoining FHFA directly.  *See Dittmer Properties,*

*L.P. v. FDIC*, 708 F.3d 1011, 1017 (8th Cir. 2013) ("Dittmer's request for injunctive relief is barred by § 1821(j), even though the FDIC is no longer the holder of the note, because the relief requested—a declaration that the note is void as to Dittmer—affects the FDIC's ability to function as receiver in th[is] case.").[14]

The institutional stockholders argue that this case is different because they claim Treasury "violated a provision of federal law unrelated to the conduct of a receivership." Institutional Pls. Reply Br. at 25. But Section 4617(f)'s plain language focuses on the "[e]ffect" of "any action" on FHFA's exercise of its powers; the cause of that effect is textually irrelevant. What matters here is that the institutional stockholders' claims against Treasury are integrally and inextricably interwoven with FHFA's conduct as conservator. Specifically, the complaint alleges that Treasury violated a provision of the Recovery Act—the very same law that governs FHFA's conservatorship activities—and that the Recovery Act prevented Treasury from entering into the Third Amendment with the Companies, operating at the direction of FHFA as conservator. Such a holding would just be another way of declaring that the Recovery Act barred FHFA from entering the Companies into the Third Amendment with Treasury. Treasury's action thus cannot be enjoined without simultaneously unraveling FHFA's own exercise of its powers and functions.

---

[14] *See also Kuriakose v. Federal Home Loan Mortgage Corp.*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009) ("By moving to declare unenforceable the non-participation clause in Freddie Mac severance agreements, in essence Plaintiffs are seeking an order which restrains the FHFA from enforcing this contractual provision in the future. * * * [The Recovery Act] clearly provides that this Court does not have the jurisdiction to interfere with such authority.").

In so holding, we have no occasion to decide whether or how Section 4617(f) might apply to "an order against a third party [that] would be of little consequence to [FHFA's] overall functioning as receiver" or conservator, *Hindes*, 137 F.3d at 161, or to third-party activities that are by their nature less interwoven with FHFA's judgments as conservator or receiver. It is enough that, in this case, the direct and unavoidable effect of invalidating Treasury's contract with the Companies would be to void the contract with Treasury that FHFA concluded on the Companies' behalf. That would be a "dramatic and fundamental" incursion on FHFA's exercise of its conservatorship authority. *Id.*[15]

## IV.    The Class Plaintiffs' Claims

The class plaintiffs appeal the dismissal of their claims against Treasury, the FHFA, and the Companies (as nominal defendants) for breach of fiduciary duty,[16] and against the FHFA and the Companies for breach of contract and for breach

---

[15] None of the cases that plaintiffs cite has anything to do with third-party claims that would directly restrain or affect the actions of a conservator. *See, e.g.*, *Ecco Plains, LLC v. United States*, 728 F.3d 1190, 1202 n.17 (10th Cir. 2013) (stating that Section 1821(j) does not apply to a claim for money damages); *National Trust II*, 995 F.2d at 241 (characterizing Section 1821(j) as "[t]he prohibition against restraining the FDIC" in a case that only sought to restrain the FDIC itself).

[16] The class plaintiffs named the Companies as nominal defendants to their derivative claims on behalf of the Companies for breach of fiduciary duty because "the corporation in a shareholder derivative suit should be aligned as a defendant when the corporation is under the control of officers who are the target of the derivative suit." *Knop v. Mackall*, 645 F.3d 381, 382 (D.C. Cir. 2011).

of the implied covenant of good faith and fair dealing.[17]  Two groups of institutional shareholders – namely, the Arrowood plaintiffs and the Fairholme plaintiffs – likewise asserted common-law claims in district court (in addition to their APA claims), but they did not preserve their appeal against the dismissal of those claims:  They did not raise in their opening brief their claims for breach of contract.   The Fairholme plaintiffs also forfeited their claim for breach of fiduciary duty against the FHFA by failing to raise in their opening brief the district court's alternative holding that the "claim is derivative . . . and, therefore, barred under § 4617(b)(2)(A)(i)," *Perry Capital LLC*, 70 F. Supp. 3d at 229 n.24.  *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1086 (D.C. Cir. 2007).

## A.  The Claims Against Treasury

The class plaintiffs alleged that by executing the Third Amendment Treasury violated fiduciary duties to the Companies and their shareholders that are imposed by state corporate law because it is a controlling shareholder in the Companies.  We have subject matter jurisdiction over the class plaintiffs' claims for breach of fiduciary duty against Treasury because "all civil actions to which [Freddie Mac] is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions."  12 U.S.C. § 1452(f); *see also Lackey v. Wells Fargo Bank, N.A.*, 747 F.3d 1033, 1035 n.2 (8th Cir. 2014) ("Because Freddie Mac is a party to this case,

---

[17] The FHFA and the Companies submitted a joint brief.  When describing their arguments on appeal, therefore, we will refer to them collectively as the FHFA.

the district court had original jurisdiction pursuant to 12 U.S.C. § 1452(f)").[18]

---

[18] We previously have interpreted a so-called "Deemer Clause" to provide jurisdiction under 28 U.S.C. § 1331, *Auction Co. of Am. v. FDIC*, 132 F.3d 746, 751 (D.C. Cir. 1997), *clarified on denial of reh'g*, 141 F.3d 1198 (1998), but have also held a Deemer Clause instead grants jurisdiction "directly" under Article III, § 2 of the Constitution, *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1460 (D.C. Cir. 1995). Although we need not decide which is the correct approach, we must assure ourselves the Congress has "not expand[ed] the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983). For federally chartered organizations such as Freddie Mac, the Congress may grant federal jurisdiction "so long as the legislature does more than merely confer a new jurisdiction," but also "ensure[s] the proper administration of some federal law (although the disputed issues in any specific case may be confined to matters of state law)." *A.I. Trade*, 62 F.3d at 1461-62 (internal quotation marks and brackets omitted).

Whether the Deemer Clause is constitutional depends upon the substantive law anchoring that grant of federal jurisdiction today, not just the legislation extant when the clause was enacted, viz., the Emergency Home Finance Act of 1970, Pub. L. No. 91-351, § 303(e)(2), 84 Stat. 450, 453. Federal law today governs the composition and election of Freddie Mac's board of directors, 12 U.S.C. § 1452(a)(2), limits its capital distributions, § 1452(b), sets forth in detail both the powers of and limitations upon Freddie Mac with respect to its purchase and disposition of mortgages, §§ 1452(c), 1454(a), exempts the company from certain taxes, § 1452(e), and provides for conservatorship or receivership by the FHFA, § 4617. *Cf. A.I. Trade*, 62 F.3d at 1463. An issue of federal law may well arise in a suit involving Freddie Mac and "the potential application of that law provides a sufficient predicate for the exercise of the federal judicial power." *Id.* at 1462. The Congress may, "by bringing all such disputes within the unifying jurisdiction of the

Whether sovereign immunity shields Treasury from suit is a trickier question because the class plaintiffs forfeited any argument under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), by failing to respond to Treasury's contention that the FTCA is inapplicable. *Cf. NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) ("[A]rguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice"). The class plaintiffs argue the APA provides an alternate waiver of sovereign immunity for their claims for breach of fiduciary duty against Treasury. Under 5 U.S.C. § 702,

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . .

We agree with the class plaintiffs with respect to their pleas for declaratory relief against Treasury for several reasons.

First, the class plaintiffs sought "relief other than money damages," to which the waiver of § 702 is limited, by requesting a declaration that Treasury breached its fiduciary duties. *Bowen v. Massachusetts*, 487 U.S. 879, 892 (1988)

---

federal courts," avoid or ameliorate the potential for "diverse interpretations of those substantive provisions" that may prove "vexing to the very commerce" the provisions were undoubtedly "enacted to promote." *Id.* at 1463.

(holding declaratory relief is not "money damages").[19] Therefore, § 702 waives immunity for the class plaintiffs' claims for breach of fiduciary duty insofar as they seek declaratory relief.

Second, § 702 waives Treasury's immunity for the claims for breach of fiduciary duty because they are not founded upon a contract. The waiver in § 702 does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *See also Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). We have interpreted the Tucker Act, 28 U.S.C. § 1491(a)(1), which waives sovereign immunity for some claims "founded . . . upon" a contract and brought in the U.S. Court of Federal Claims, to "impliedly forbid[]" contract claims against the Government from being brought in district court under the waiver in the APA. *Albrecht*, 357 F.3d at 67-68. Treasury on appeal does not dispute the class plaintiffs' characterization of their claims as not contractual, though the agency argued in district court that the claims were in essence a contract action because it "assumed [any fiduciary duties] in entering into the

---

[19] Contrary to the class plaintiffs' assertions, however, their request for "[s]uch other and further relief as the Court may deem just and proper" does not qualify as non-monetary relief. J.A. 279 ¶ 12. Such boilerplate requests – which refer to the proviso of Federal Rule of Civil Procedure 54(c) that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings" – "come[] into play only after the court determines it has jurisdiction." *See Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.2 (D.C. Cir. 2004) (Roberts, J.). The class plaintiffs do not argue that their request for "disgorgement," J.A. 278 ¶ 5, is not "money damages." Nor do they invoke the request for rescission of the Third Amendment that appears outside of the prayer for relief in their complaint.

[Stock Agreements]" with Fannie Mae and Freddie Mac. Treasury Defs. Mem. in Support of Mot. To Dismiss or for Summ. J., Doc. No. 19-1, at 44 *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.*, 1:13-mc-01288 (Jan. 17, 2014). That Treasury has not briefed the issue on appeal does not, however, relieve us of our obligation to assure ourselves we have jurisdiction, *see Steel Co.*, 523 U.S. at 94; this obligation extends to sovereign immunity because it is "jurisdictional in nature," *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), and may not be waived by an agency's conduct of a lawsuit, *Dep't of the Army v. FLRA*, 56 F.3d 273, 275 (D.C. Cir. 1995).

In order to determine whether an action is in "its essence" contractual, we examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also Albrecht*, 357 F.3d at 68-69. The class plaintiffs claim that, because it is the controlling shareholder, Treasury owes the Companies and their shareholders "fiduciary duties of due care, good faith, loyalty, and candor." J.A. 275 ¶ 177; *see also* Derivative Compl., Doc. No. 39, at 27 ¶ 74 *In re Fannie Mae/Freddie Mac*, 1:13-mc-01288 (July 30, 2014). These claims against Treasury are not "a disguised contract action," *Megapulse, Inc.*, 672 F.2d at 968, because they do not seek to enforce any duty imposed upon Treasury by the Stock Agreements – the only relevant contracts to which Treasury is a party. Although any fiduciary duty allegedly owed by Treasury as a controlling shareholder in the Companies arose from its purchase of shares pursuant to the Stock Agreements, we do not think that "*any* case requiring *some* reference to . . . a contract is necessarily *on the contract* and therefore directly within the Tucker Act." *Id.* at 967-68. The class plaintiffs do not contend Treasury breached the terms

of the Stock Agreements nor otherwise invoke them except to establish that Treasury is a controlling shareholder.

The relief the class plaintiffs seek does not further illuminate whether their claims are essentially contractual. In *Megapulse*, we held the action was not founded upon a contract in part because the plaintiffs sought no specific performance of the contract and no damages, 672 F.2d at 969, presumably because specific performance is an explicitly contractual remedy and because "damages are a prototypical contract remedy," *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995). Here, the class plaintiffs seek a declaration that Treasury breached its fiduciary duties and an award of "compensatory damages" in favor of the Companies. These forms of relief are not specific to actions that sound in contract, *cf. Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894-95 (D.C. Cir. 1985) (concluding a claim was essentially contractual in part because the relief sought amounted to "the classic contractual remedy of specific performance"), and any relief would not be determined by reference to the terms of the contract, *cf. Albrecht*, 357 F.3d at 69 (concluding a claim was essentially contractual in part because a contract would "determine whether the relief sought . . . is available").[20] The plaintiffs also seek rescission with respect to their claim

---

[20] The class plaintiffs also request "disgorgement" in favor of the Companies, but they do not explain further what measure of relief they seek and on appeal they appear to characterize the plea as one for damages. We do not take the class plaintiffs to seek more than restitution of the dividends paid to Treasury pursuant to the Third Amendment and in excess of the 10% dividend, because they have not alleged that Treasury has otherwise profited from its execution of the Third Amendment. Restitution of the benefits conferred by a plaintiff is not specific to claims for breach of contract, 1 DAN B. DOBBS, LAW OF REMEDIES § 4.1(1), pp. 552-53 (2d ed. 1993), so the plea for disgorgement does not alter our analysis.

regarding Fannie Mae. This plea does not render the claim essentially contractual even though rescission is typically a remedy for breach of contract because there is no question that any breach of contract claim would concern the Purchase Agreement and the class plaintiffs seek rescission of only the Third Amendment. In sum, the Tucker Act does not "impliedly forbid[]" us from awarding relief against Treasury based on the waiver of immunity in § 702 because the class plaintiffs' claims are not founded upon a contract.

Third, Treasury's argument that § 702 does not waive its immunity from suit for state law claims is foreclosed by our precedent. We have "repeatedly" and "expressly" held in the broadest terms that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (internal quotation marks omitted). Furthermore, we concluded in *United States Information Agency v. Krc*, 989 F.2d 1211 (D.C. Cir. 1993), that § 702 waived sovereign immunity for a (presumably) state tort claim against the Government because the FTCA did not "impliedly forbid" the non-monetary relief the plaintiff sought. *Id.* at 1216 (citing § 702).

Fourth, the class plaintiffs forthrightly point out that we have held "the waiver of sovereign immunity under § 702 is limited by the 'adequate remedy' bar of § 704," *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 947 (D.C. Cir. 2004) (quoting 5 U.S.C. § 704); *see also Transohio Sav. Bank v. Dir., OTS*, 967 F.2d 598, 607 (D.C. Cir. 1992), and go on to argue we should look to more recent authority that contradicts those holdings, *see Trudeau*, 456 F.3d at 187-89. Again, that Treasury has no response to this point does not relieve us of our duty to ascertain whether Treasury's immunity has been waived. We agree with the class plaintiffs that the holdings in

*National Wrestling* and *Transohio Savings* are no longer good law.

Section 704 provides that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. In *Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011) (en banc), after first concluding that immunity from suit was waived by § 702 with nary a mention of the adequate remedy bar of § 704, *id.* at 722-31, we held that whether there is an "other adequate remedy" for the purpose of § 704 determines whether a litigant states "a valid cause of action" under the APA. *Id.* at 731. We did not expressly speak to whether the adequate remedy bar limits immunity, but it strains credulity to think the choice to address the adequate remedy bar not as a condition of immunity, but instead as a requirement for a cause of action, was not deliberate in that case.

A further reason for this reading of *Cohen* is that we there cited approvingly, *id.* at 723, our prior holding in *Trudeau*, 456 F.3d 178, that the requirement of final agency action in § 704 is not a condition of the waiver of immunity in § 702, but instead limits the cause of action created by the APA, *id.* at 187-89. The holding of *Trudeau* and its endorsement in *Cohen* clearly override *National Wrestling* and *Transohio Savings*: We see no textual or logical basis for construing § 704 – which limits judicial review to "final agency action for which there is no other adequate remedy" – to condition a waiver of sovereign immunity on the absence of an adequate remedy but not on the presence of final agency action. In *Trudeau* we concluded the finality requirement does not bear upon the waiver of immunity in § 702 because the waiver "is not limited to APA cases – and hence . . . it applies regardless of whether the elements of an APA cause of action [under § 704] are satisfied." *Id.* at 187. This reasoning applies equally to the adequate remedy bar. *See*

*Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 661 (D.C. Cir. 2010) (relying in part upon our holding that the finality requirement no longer limits a court's subject matter jurisdiction to reach the same conclusion for the adequate remedy bar and referring to them collectively as the "the APA's reviewability provisions").

Furthermore, in a departure from prior cases, we have several times recognized that the finality requirement and adequate remedy bar of § 704 determine whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction. *Cent. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805-06 (D.C. Cir. 2006); *Trudeau*, 456 F.3d at 183-85; *Shinseki*, 599 F.3d at 661; *Cohen*, 650 F.3d at 731 & n.10. Reading § 704 to limit only the cause of action that may be brought under the APA and not the grant of immunity in § 702 is in line with our new understanding of § 704 as narrowly focused upon the requirements for the APA cause of action. We therefore hold that § 702 waives Treasury's immunity regardless whether there is another adequate remedy under § 704 because the absence of such a remedy is instead an element of the cause of action created by the APA.

In sum, pursuant to 12 U.S.C. § 1452(f) and 28 U.S.C. § 1291, we have subject matter jurisdiction over the class plaintiffs' claims against Treasury for breach of fiduciary duty, and the Congress waived the agency's immunity from suit for these claims, insofar as they are for declaratory relief, in the APA, 5 U.S.C. § 702. We nonetheless affirm the district court's dismissal of the claims for a declaratory judgment. As discussed in greater detail above, *supra* at 38-40, 12 U.S.C. § 4617(f) bars us from awarding equitable relief against Treasury with respect to the Third Amendment because doing

so would impermissibly "restrain or affect the exercise of powers or functions of the [FHFA] as a conservator."

## B. The Claims Against the FHFA and the Companies

The class plaintiffs sued the FHFA (and the Companies, as nominal defendants) for breach of fiduciary duties imposed on a corporation's management under state law. They also alleged claims against the FHFA and the Companies for breach of contract and breach of the implied covenant of good faith and fair dealing. We have subject matter jurisdiction over the class plaintiffs' claims under 12 U.S.C. § 1452(f). As mentioned above, our obligation to assure ourselves we have jurisdiction, *see Steel Co.*, 523 U.S. at 94, extends to sovereign immunity because it is jurisdictional, *Meyer*, 510 U.S. at 475. "A waiver . . . must be unequivocally expressed in statutory text," *Lane v. Pena*, 518 U.S. 187, 192 (1996), so the Government may not waive immunity merely by its conduct in a lawsuit, *Dep't of the Army*, 56 F.3d at 275. We therefore disregard FHFA's point that the agency, "in its capacity as Conservator, has not asserted sovereign immunity with respect to [its] execution of the Third Amendment." FHFA July 2016 Supp. Br. at 4.

Assuming the FHFA has sovereign immunity when it acts on behalf of the Companies as conservator, *cf. Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1201-02 (D.C. Cir. 1998) (holding a suit against the FDIC was a suit against the United States for purposes of jurisdiction and sovereign immunity where the FDIC "did not act as receiver for any particular depository"), the Congress has waived the agency's immunity by consenting to suit. The Congress has granted Freddie Mac "power . . . to sue and be sued . . . in any State, Federal, or other court," 12 U.S.C. § 1452(c)(7), and has granted Fannie Mae the same "power . . . to sue and to be sued . . . in any court of competent jurisdiction, State or Federal," *id.* § 1723a(a). The

FHFA "by operation of law[] immediately succeed[ed] to . . . all . . . powers" of the Companies upon its appointment as conservator – including the Companies' power to sue and be sued – under the so-called Succession Clause of the Recovery Act. *Id.* § 4617(b)(2)(A)(i). Such a statutory grant of power to "sue and be sued" constitutes an "unequivocally expressed" waiver of sovereign immunity. *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 33-34 (1992); *see also Meyer*, 510 U.S. at 475.[21]

By providing for the FHFA to succeed to the Companies' power to sue and be sued, the Congress has given its express consent that the FHFA is subject to suit in the same way the Companies would otherwise be when the agency acts on their behalf as conservator. This understanding is borne out by the FHFA's other functions under the Succession Clause, which further provides that the FHFA succeeds to "all rights, titles, powers, and privileges of the regulated entity." § 4617(b)(2)(A)(i). The Supreme Court interpreted the nearly identical provision in FIRREA to "place[] the FDIC in the shoes of the [entity in receivership], to work out its claims under state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86-87 (1994) (interpreting 12 U.S.C. § 1821(d)(2)(A)(i)). The Recovery Act further empowers the FHFA, as conservator, to "take over the assets of and operate the [Companies] with all the powers of [their] shareholders, . . . directors, and . . . officers" and to "perform all functions of the [Companies] in the name of the [Companies]." 12 U.S.C. § 4617(b)(2)(B)(i), (iii).

---

[21] We need not reach the question whether the FHFA's conservatorship of Fannie Mae and Freddie Mac endows the Companies with sovereign immunity because their "sue and be sued" clauses would waive any immunity.

What if the class plaintiffs' claims for breach of fiduciary duty are cognizable under the FTCA, 28 U.S.C. § 1346(b)? The FTCA does not withdraw the Congress's waiver of immunity in this case, for the FTCA provides:

> The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under [the FTCA], and the remedies provided by this title in such cases shall be exclusive.

28 U.S.C. § 2679(a). The Congress has not, however, authorized the FHFA to be sued "in its own name" by enacting a "sue and be sued" clause specifically for the agency. Instead, the Congress has granted the FHFA the power to be sued just as the Companies would be absent a conservatorship insofar as the agency steps into the shoes of the Companies and acts on their behalf to defend alleged breaches of their obligations. Because the Companies, pre-conservatorship, were not affected by the FTCA proviso cited above, neither is the FHFA when it is sued for an action taken on their behalf – in this case, the Third Amendment.[22] Nor would the Tucker Act, 28 U.S.C.

---

[22] It follows that the FTCA does not apply to Fannie Mae or Freddie Mac either, even though the FHFA, as conservator, exercises complete control over the Companies. The statute provides that the remedies set forth in the FTCA "shall be exclusive" despite any "sue and be sued" clause of a "federal agency," 28 U.S.C. § 2679(a), which includes "corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States," *id.* § 2671. Generally, we determine whether a defendant is such a corporation that is subject to the FTCA by examining whether the Federal Government has the power "'to control the detailed physical performance of the [corporation].'" *Macharia v. United States*, 334 F.3d 61, 68 (D.C. Cir. 2003) (quoting

§ 1491(a)(1), require the class plaintiffs to file their claims for breach of contract in the Court of Federal Claims. "If a separate waiver of sovereign immunity and grant of jurisdiction exist, district courts may hear cases over which, under the Tucker Act alone, the Court of Federal Claims would have exclusive jurisdiction." *Auction Co. of Am. v. FDIC*, 132 F.3d 746, 752 n.4 (D.C. Cir. 1997) (suit for breach of contract), *clarified on denial of reh'g*, 141 F.3d 1198 (1998).

## 1. The Succession Clause

The FHFA and the class plaintiffs dispute whether the common-law claims against the agency are barred by the so-called Succession Clause, which provides that the FHFA, as conservator, "succeed[s] to" the stockholders' rights "with respect to" the Companies and their assets, 12 U.S.C. § 4617(b)(2)(A)(i). In *Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012), we held the Succession Clause "plainly transfers [to the FHFA the] shareholders' ability to bring derivative suits" on behalf of the Companies, but left open whether it transfers claims as to which the FHFA would face a manifest conflict of interest. *Id.* at 850.

The class plaintiffs argue the Succession Clause should not be read to bar their derivative claims for breach of fiduciary duty because the FHFA would face a conflict of interest in pursuing, on behalf of the Companies, claims against itself. They also argue the Succession Clause does not apply to their

*United States v. Orleans*, 425 U.S. 807, 814 (1976)). As we have just concluded, however, the Recovery Act evinces the Congress's intention to "place[]" the FHFA "in the shoes" of the Companies, *O'Melveny & Myers*, 512 U.S. at 86-87, which become wards of the Government. The Companies therefore remain subject to suit as private corporations for violations of state law just as they were before the FHFA was appointed conservator.

direct claims for breach of contract and for breach of fiduciary duty. The FHFA responds that the Succession Clause transfers to it the right to bring derivative suits without exception, that all the claims of the class plaintiffs are derivative, and that the Succession Clause also transfers any direct claims to the agency.

The district court held the statute bars all the class plaintiffs' claims and dismissed them "pursuant to [Federal Rule of Civil Procedure] 12(b)(1) for lack of standing," *Perry Capital LLC*, 70 F. Supp. 3d at 233, 235 n.39, 239 n.45, but whether the Succession Clause bars the claims has no bearing upon standing under Article III of the Constitution of the United States. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The district court's error, however, is of no moment; we simply examine the issue under Rule 12(b)(6). *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("Although the district court erroneously dismissed the action pursuant to Rule 12(b)(1), we could nonetheless affirm the dismissal if dismissal were otherwise proper based on failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)").

We conclude the Succession Clause transfers to the FHFA without exception the right to bring derivative suits but not direct suits. The class plaintiffs' claims for breach of fiduciary duty are derivative and therefore barred, but their contract-based claims are direct and may therefore proceed.

### a. The Succession Clause bars derivative suits, but not direct suits

The Recovery Act transfers some of the shareholders' rights to the FHFA during conservatorship and receivership and provides that others are retained by the shareholders during

conservatorship but terminated during receivership. Specifically, the Succession Clause provides that "as conservator or receiver" the FHFA "shall . . . by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder . . . with respect to the regulated entity and [its] assets." § 4617(b)(2)(A)(i). The Recovery Act further limits shareholders' rights during receivership by providing that the FHFA's appointment as receiver and consequent succession to the shareholders' rights "terminate[s] all rights and claims that the stockholders . . . of the regulated entity may have against the assets or charter of the regulated entity or the [FHFA] . . . except for their right to payment, resolution, or other satisfaction of their claims" in the administrative claims process. § 4617(b)(2)(K)(i).

The Recovery Act thereby transfers to the FHFA all claims a shareholder may bring derivatively on behalf of a Company whilst claims a shareholder may lodge directly against the Company are retained by the shareholder in conservatorship but terminated during receivership. The Act distinguishes between the transfer of rights "with respect to the regulated entity and [its] assets" in the Succession Clause and the termination of rights "against the assets or charter of the regulated entity" in § 4617(b)(2)(K)(i). Rights "with respect to" a Company and its assets are only those an investor asserts derivatively on the Company's behalf. *Cf. Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014) (so interpreting the analogous provision of FIRREA, 12 U.S.C. § 1821(d)(2)(A)(i)). Rights and claims "against the assets or charter of the regulated entity" are an investor's direct claims against and rights to the assets of the Company once it is placed in receivership in order to be liquidated, *see* 12 U.S.C. § 4617(b)(2)(E); that the Recovery Act terminates such rights and claims in receivership indicates

that shareholders' direct claims against and rights in the Companies survive during conservatorship.[23]

This reading is borne out by the statutory context. If the Succession Clause transferred all of the stockholders' rights to the FHFA in conservatorship and receivership, as the FHFA contends, then they would have no rights left to assert during the administrative claims process should a Company be liquidated. That result is plainly precluded by § 4617(b)(2)(K)(i), which excepts from termination upon the FHFA's appointment as receiver a shareholder's "right to payment, resolution, or other satisfaction of [his or her] claims." Furthermore, we see the logic in permitting the shareholders to retain their rights to bring suit against a Company during conservatorship and terminating those rights when the Agency institutes an administrative claims process as required when it becomes a receiver. *See* 12 U.S.C. § 4617(b)(3)-(5). We note that the Federal Circuit recently held, albeit without considering the Succession Clause, that Fannie Mae's former Chief Financial Officer had no takings claim based on the company's failure – pursuant to FHFA's regulations – to pay severance benefits as mandated by his employment contract because the CFO "was left with the right to enforce his contract against Freddie Mac in a breach of

---

[23] The FHFA argues that "[b]ecause the Conservator already can pursue derivative claims belonging to the Enterprises, the statutory phrase 'rights . . . of any stockholder' only has meaning if it encompasses direct claims." FHFA Br. at 48. This argument is foreclosed by *Kellmer*, where we determined the Succession Clause "plainly transfers [to the FHFA the] shareholders' ability to bring derivative suits," 674 F.3d at 850, and it overlooks that, when the Companies are in conservatorship, the Succession Clause functions not only to grant the FHFA powers, but also to take powers from the shareholders.

contract action . . . under state contract law." *Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016).

The class plaintiffs argue that because, as shareholders, they retain rights in the Companies during a conservatorship, the Succession Clause should be read to permit them to sue derivatively to protect those rights when the FHFA has a conflict of interest. They point to the decisions of two other circuits interpreting 12 U.S.C. § 1821(d)(2)(A), a nearly identical provision in FIRREA, to permit such an exception. *See First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1295 (Fed. Cir. 1999); *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1022-23 (9th Cir. 2001). Contrary to the class plaintiffs' assertions, two circuit court decisions do not so clearly "settle[] the meaning of [the] existing statutory provision" in FIRREA that we must conclude the Congress intended *sub silentio* to incorporate those rulings into the Recovery Act. *Merrill Lynch v. Dabit*, 547 U.S. 71, 85 (2006).

Nor are we convinced by the reasoning of those two cases that the Succession Clause implicitly excepts derivative suits where the FHFA would have a conflict of interest. The courts in those cases thought it would be irrational to transfer to an agency the right to sue itself derivatively because "the very object of the derivative suit mechanism is to permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so." *First Hartford*, 194 F.3d at 1295; *see also Delta Sav.*, 265 F.3d at 1022-23 (extending the exception to suits against certain agencies with which the conservator or receiver has an "interdependent" relationship and "managerial and operational overlap"). As the district court in this case noted, however, it makes little sense to base an exception to the rule against

derivative suits in the Succession Clause "on the purpose of the 'derivative suit mechanism,'" rather than the plain statutory text to the contrary. *See Perry Capital LLC*, 70 F. Supp. 3d at 230-31. We therefore conclude the Succession Clause does not permit shareholders to bring derivative suits on behalf of the Companies even where the FHFA will not bring a derivative suit due to a conflict of interest.

### b. The class plaintiffs' claims for breach of fiduciary duty are derivative but their contract-based claims are direct and may proceed

Having concluded the Succession Clause extends to derivative, but not direct, claims, it follows that the class plaintiffs' claims for breach of fiduciary duty are barred but their contract-based claims may proceed. The class plaintiffs contend they asserted both direct and derivative claims for breach of fiduciary duty, alleging a direct claim against the FHFA "with respect to . . . Fannie Mae" under Delaware law.[24]

---

[24] The district court applied Delaware law to the class plaintiffs' common-law claims. *See Perry Capital LLC*, 70 F. Supp. 3d at 235 n.39, 236, 238, 239 n.45. On appeal, all parties agree we should apply Delaware law to claims regarding Fannie Mae and Virginia law to those regarding Freddie Mac. The parties have thereby waived any objection to the district court's application of Delaware law to claims regarding Fannie Mae. *See A-L Assocs., Inc. v. Jorden*, 963 F.2d 1529, 1530 (D.C. Cir. 1992) (applying law "[t]he court below held, and the parties agree," was applicable); *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012); *Jannenga v. Nationwide Life Ins. Co.*, 288 F.2d 169, 172 (D.C. Cir. 1961); *cf. Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 766 (D.C. Cir. 1992) (applying U.S. contract principles to determine whether a contractual choice-of-law provision was valid where the district court had applied those principles because "both parties here

Class Pls. Br. at 21-22. In order to determine whether these claims are direct or derivative, we must examine (1) "[w]ho suffered the alleged harm" and (2) "who would receive the benefit of the recovery." *Tooley v. Donaldson, Lufkin &*

---

have assumed that American contract law principles control"). *Accord, e.g.*, *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) (holding that "parties may waive choice-of-law issues" in part because "choice-of-law questions do not go to the court's jurisdiction"). We have occasionally held a party forfeited any objection to the district court's choice of law in part because we could detect no "error," *Wash. Metro. Area Transit Auth. v. Georgetown Univ.*, 347 F.3d 941, 945 (D.C. Cir. 2003); *Nello L. Teer Co. v. Wash. Metro. Area Transit Auth.*, 921 F.2d 300, 302 n.2 (D.C. Cir. 1990), or "apparent error" in the district court's choice, *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1105 (D.C. Cir. 2012). We do not read these cases to have established a standard for forfeiture or waiver particular to choice of law, especially considering none indicated that the absence of an error or "apparent" error was necessary to the outcome. In this case, we see no reason to deviate from the district court's selection of Delaware law for the claims regarding Fannie Mae.

We need not address whether the district court should have applied Virginia law to the claims regarding Freddie Mac because, for purposes of this appeal, Delaware and Virginia law dictate the same result, *see Aref v. Lynch*, 833 F.3d 242, 262 (D.C. Cir. 2016) ("We need not determine which state's law applies . . . because the result is the same under all three" potentially applicable laws); *Skirlick v. Fid. & Deposit Co. of Md.*, 852 F.2d 1376, 1377 (D.C. Cir. 1988) (same), and the parties have waived any contention that yet another law should displace the district court's choice. The district court also cited federal case law in evaluating whether the class plaintiffs had a contractual right to dividends, *Perry Capital LLC*, 70 F. Supp. 3d at 237 & n.41, but the cited federal decisions do not displace state contract law, *cf. O'Melveny & Myers*, 512 U.S. at 85-89 (rejecting the argument that federal common law should govern tort claims lodged by the FDIC).

*Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004); *see also Gentile v. Rossette*, 906 A.2d 91, 99-101 (Del. 2006). A suit is direct if "[t]he stockholder . . . demonstrate[s] that the duty breached was owed to the stockholder" and that "[t]he stockholder's claimed direct injury [is] independent of any alleged injury to the corporation." *Tooley*, 845 A.2d at 1039.

The class plaintiffs did not plead a direct claim for breach of fiduciary duty because they did not seek relief that would accrue directly to them. They instead requested a declaration that, "through the Third Amendment, Defendant[] FHFA ... breached [its] ... fiduciary dut[y] to Fannie Mae," and sought an award of "compensatory damages and disgorgement in favor of Fannie Mae." J.A. 278 ¶¶ 4-5. Both forms of relief would benefit Fannie Mae directly and the shareholders only derivatively. *See Tooley*, 845 A.2d at 1035. The class plaintiffs also asked the district court to declare the Third Amendment was not "in the best interests of Fannie Mae or its shareholders, and constituted waste and a gross abuse of discretion," J.A. 278 ¶ 3, but a declaration that only partially resolves a cause of action does not remedy any injury. *Cf. Calderon v. Ashmus*, 523 U.S. 740, 746-47 (1998) (holding that the case or controversy requirement of Article III was not satisfied where a prisoner sought a declaratory judgment as to the validity of a defense a state was likely to raise in his habeas action). In the introductory portion of their complaint, the class plaintiffs also sought rescission of the Third Amendment to remedy the alleged breach of fiduciary duty, but the class plaintiffs requested this relief only for their derivative claim. J.A. 215 ¶ 3 ("This is also a derivative action brought by Plaintiffs on behalf of Fannie Mae, seeking . . . equitable relief, including rescission, for breach of fiduciary duty"), 226 ¶ 27 ("[T]his action also seeks, derivatively on behalf of Fannie Mae, an award of . . . equitable relief with respect to such breach, including rescission of the Third Amendment").

In any event, the class plaintiffs forfeited in district court any argument that their claim for breach of fiduciary duty is direct. In its motion to dismiss, the FHFA contended the class plaintiffs' claims for breach of fiduciary duty were derivative, but the class plaintiffs did not respond by arguing they asserted a direct claim. Although they occasionally referred to the FHFA's fiduciary duties to the shareholders, the class plaintiffs did not develop any argument that the claims are direct and instead discussed separately why the Succession Clause does not bar "Their Direct Contract-Based Claims," Mem. in Opp'n to Mot. to Dismiss, Doc. No. 33 at 25 *In re Fannie Mae/Freddie Mac*, 1:13-mc-01288 (Mar. 21, 2014) (hereinafter Class Pls. Opp'n to Mot. to Dismiss), and "Their Derivative Claims" for breach of fiduciary duty, *id.* at 32. The class plaintiffs then characterize their only count of breach of fiduciary duty as asserting "derivative claims." *Id.*

The class plaintiffs ask for a "remand to allow [them] to pursue their direct fiduciary breach claims regarding the Fannie Mae Third Amendment." Class Pls. Br. at 23. At oral argument they cited *DKT Memorial Fund v. Agency for International Development*, 810 F.2d 1236 (D.C. Cir. 1987), in which this court, "in the interest of justice," granted counsel's motion at oral argument to amend the complaint in order to correct an inadvertent error and then ruled the claims, as amended, were not subject to dismissal upon the grounds asserted by the defendants. *Id.* at 1239. In this case the class plaintiffs ask us to grant them leave to amend the complaint to add a new claim they are not asking us to rule on but instead want to pursue in district court. We see no reason to oust the district judge from making that decision in the first instance when the case returns to district court for further proceedings on certain of the plaintiffs' contract-based claims.

The district court also held the class plaintiffs' contract-based claims were derivative. *Perry Capital LLC*, 70 F. Supp. 3d at 235 & n.39, 239 n.45. Contrary to the FHFA's assertions, the class plaintiffs sufficiently appealed this ruling. Their statement of issues on appeal comprises whether the Succession Clause "bars any of Appellants' claims in this action." Furthermore, that the class plaintiffs' contract-based claims are direct is apparent from their extensive discussion of the FHFA's alleged breach of their contractual rights and the harm the alleged breach caused them.

Indeed, the contract-based claims are obviously direct "because they belong to" the class plaintiffs "and are ones that only [the class plaintiffs] can assert." *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1138 (Del. 2016). These are "not claims that could plausibly belong to" the Companies because they assert that the Companies breached contractual duties owed to the class plaintiffs by virtue of their stock certificates. *Id.* We therefore do not subject them to the two-part test set forth in *Tooley*, which determines "when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively." *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015). The two-part test is necessary "[b]ecause directors owe fiduciary duties to the corporation and its stockholders, [and] there must be some way of determining whether stockholders can bring a claim for breach of fiduciary duty directly, or whether a particular fiduciary duty claim must be brought derivatively." *Citigroup Inc.*, 140 A.3d at 1139 (footnote omitted). *Tooley* has no application "when a plaintiff asserts a claim based on the plaintiff's own right." *Id.* at 1139-40; *El Paso Pipeline GP Co. v. Brinckerhoff*, 2016 WL 7380418, at *9 (Del. Dec. 20, 2016) ("[W]hen a plaintiff asserts

a claim based upon the plaintiff's own right . . . *Tooley* does not apply").[25]

### 2. The Class Plaintiffs' contract-based claims

As a preliminary matter, the class plaintiffs assert the bar to equitable relief of 12 U.S.C. § 4617(f), discussed above, does not apply "to equitable claims related to contractual breaches," Class Pls. Br. at 34-35, but this argument is forfeit because it was not raised in district court. *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 22 (D.C. Cir. 2010). Accordingly, we evaluate the class plaintiffs' contract-based claims only insofar as they seek damages. As discussed in greater detail above, *supra* at 17-37, an award of equitable relief against the FHFA with respect to the Third Amendment would impermissibly "restrain or affect the exercise of powers or functions of the [FHFA] as a conservator," § 4617(f), and a similar award against the Companies would plainly achieve the same result. The class plaintiffs next challenge the district court's dismissal under Rules 12(b)(1) and (6) of their claims against the FHFA and the Companies for breach of contract and breach of the implied covenant as to the provisions in the stock

---

[25] The class plaintiffs (the only party to address on the merits whether the contract-based claims are direct or derivative) cite only Delaware law in addressing the claims for breach of contract as to both Fannie Mae and Freddie Mac despite their assumption that Virginia law governs claims against Freddie Mac. The issue need detain us no further because we have found no indication Virginia would classify the breach of contract claims as derivative. *Cf. Simmons v. Miller*, 261 Va. 561, 573, 544 S.E.2d 666, 674 (2001) ("A derivative action is an equitable proceeding in which a shareholder asserts, on behalf of the corporation, a claim that belongs to the corporation rather than the shareholder . . . . [A]n action for injuries to a corporation cannot be maintained by a shareholder on an individual basis and must be brought derivatively.").

certificates dealing with voting and dividend rights and liquidation preferences. Upon *de novo* review, *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011), we affirm the dismissal of all claims except for those regarding the liquidation preferences and the claim for breach of implied covenant regarding dividend rights.

### a. Voting rights

The class plaintiffs contend the Third Amendment violates their stock certificates that, with some variations not relevant here, provide that a vote of two thirds of the stockholders is required "to authoriz[e], effect[] or validat[e] the amendment, alteration, supplementation or repeal of any of the provisions of [the] Certificate if such [action] would materially and adversely affect the . . . terms or conditions of the [stock]." J.A. 251. The class plaintiffs claim they were entitled to vote on the Third Amendment because it "nullif[ied] their right ever to receive a dividend or liquidation distribution," and thereby "materially and adversely affect[ed]" them. Class Pls. Reply Br. at 11. The FHFA does not respond to this argument on appeal, and the district court nowhere addressed it in dismissing the contract-based claims. We nonetheless affirm the district court's dismissal. Although the Third Amendment makes it impossible for the class plaintiffs to receive dividends or a liquidation preference, it was not an "alteration, supplementation or repeal of . . . provisions" in the certificates. Those provisions guarantee only the right to vote on certain changes to the certificates, not on any corporate action that affects the rights guaranteed by the certificates.

### b. Dividend rights

The class plaintiffs' various stock certificates provide (with irrelevant variations in wording) that stockholders will

"be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion . . . [,] non-cumulative cash dividends," J.A. 248, or "shall be entitled to receive, ratably, dividends . . . when, as and if declared by the Board," J.A. 250. According to the class plaintiffs, the certificates thereby guarantee them a right to dividends, discretionary though they may be. We agree with the FHFA's response that the class plaintiffs have no enforceable right to dividends because the certificates accord the Companies complete discretion to declare or withhold dividends.

The class plaintiffs argue they nonetheless have a contractual right to discretionary dividends because Delaware and Virginia limit directors' discretion to withhold dividends. This limit upon a board's discretion stems from its fiduciary duties to shareholders, not from the terms of their stock certificates. *See Gabelli & Co. v. Liggett Grp. Inc.*, 479 A.2d 276, 280 (Del. 1984) (Dividends may not be withheld as a result of "fraud or gross abuse of discretion"); *Penn v. Pemberton & Penn, Inc.*, 189 Va. 649, 658, 53 S.E.2d 823, 828 (Va. 1949) (Failure to declare dividends is actionable if it "is so arbitrary, or so unreasonable, as to amount to a breach of trust"). Such fiduciary duties have no bearing upon whether the terms of the contracts imposed a duty to declare dividends, as the class plaintiffs alleged.

Lastly, the class plaintiffs advance a convoluted argument that the Third Amendment violated their rights to receive mandatory dividends (1) for their preferred stock before any distributions on common stock, and (2) for their common stock "ratably," along with other holders of such stock. Before the Third Amendment, the class plaintiffs assert, Treasury could have received a dividend exceeding the 10% coupon on its liquidation preference only by exercising its option to purchase up to 79.9% of the Companies' common stock, and the

payment of any dividend on that common stock would have required distributions to the class plaintiffs as well.  To the class plaintiffs, it follows that their right to mandatory dividends was breached by the provision of the Third Amendment for dividends to be paid to Treasury that could (and at times did) exceed the 10% coupon.  This argument fails because the plaintiffs have not shown their certificates guarantee that more senior shareholders will not exhaust the funds available for distribution as dividends.  The class plaintiffs contend the Third Amendment "was a fiduciary breach, and hence cannot be relied on as the basis for nullifying the *mandatory* priority and ratability rights," Class Pls. Br. at 39, but this argument goes to their claims for breach of fiduciary duty, addressed above.

The class plaintiffs next challenge the district court's dismissal of their claim that the implied covenant prohibited the FHFA from depriving them of the opportunity to receive dividends.  The class plaintiffs argue the district court wrongly concluded the FHFA did not breach the implied covenant because it acted within its statutory authority.  *See Perry Capital LLC*, 70 F. Supp. 3d at 238-39.  The FHFA contends the plaintiffs "try to impose fiduciary and other duties on the Conservator to always act in the best interests of shareholders, when [the Recovery Act] instead authorizes the Conservator to '[act] in the best interests of the [Companies] or the Agency,'" FHFA Br. at 18 (citing § 4617(b)(2)(J)(ii)) (second alteration in original), and that "the Conservator's discretion to declare dividends, unlike that of a corporate board, is without limitation," *id.* at 56 n.21.  Insofar as the FHFA argues (and the district court held) that the Recovery Act preempts state law imposing an implied covenant, this approach is foreclosed by the plain text of the Recovery Act and by our precedent.

Virginia and Delaware law imposing an implied covenant of good faith and fair dealing is not "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hillman v. Maretta*, 133 S. Ct. 1943, 1949-50 (2013), and is therefore not preempted by the Recovery Act. The Recovery Act provides that the FHFA, as conservator, "may disaffirm or repudiate any contract" the Companies executed before the conservatorship "the performance of which the conservator . . . determines to be burdensome," 12 U.S.C. § 4617(d)(1), "within a reasonable period following" the agency's appointment as conservator, *id.* § 4617(d)(2). That the Recovery Act permits the FHFA in some circumstances to repudiate contracts the Companies concluded before the conservatorship indicates that the Companies' contractual obligations otherwise remain in force. *Cf. Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 700-01 (D.C. Cir. 1997) (so interpreting a nearly identical provision in FIRREA, 12 U.S.C. § 1821(e)). Furthermore, by providing for the FHFA to succeed to "all rights, titles, powers, and privileges of the [Companies]," 12 U.S.C. § 4617(b)(2)(A)(i), the Recovery Act places the FHFA "'in the shoes'" of the Companies and "does not permit [the agency] to increase the value of the [contract] in its hands by simply 'preempting' out of existence pre-receivership contractual obligations." *Waterview Mgmt. Co.*, 105 F.3d at 701 (quoting *O'Melveny & Myers*, 512 U.S. at 87, in reaching the same conclusion for the Succession Clause of FIRREA, 12 U.S.C. § 1821(d)(2)(A)(i)).

The class plaintiffs next challenge the district court's conclusion that they failed to state a claim for breach of the implied covenant, which they contend required the Companies – and, therefore, their conservator – to act reasonably and not to deprive them of the fruits of their bargain, namely the opportunity to receive dividends. The FHFA urges us to affirm the district court's determination that the class plaintiffs' lack

of an enforceable contractual right to dividends foreclosed the claim that the implied covenant instead provided such a right. *See Perry Capital LLC*, 70 F. Supp. 3d at 238.

Under Delaware law, "[e]xpress contractual provisions always supersede the implied covenant," *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013), and "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement," *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 441 (Del. 2005). Here, however, the stock certificates upon which the class plaintiffs rely provide for dividends "if declared by the Board of Directors, in its sole discretion." J.A. 248. A party to a contract providing for such discretion violates the implied covenant if it "act[s] arbitrarily or unreasonably." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *see also Gerber*, 67 A.3d at 419 ("When exercising a discretionary right, a party to the contract must exercise its discretion reasonably" (emphasis omitted)). What is arbitrary or unreasonable depends upon "the parties' reasonable expectations at the time of contracting." *Nemec*, 991 A.2d at 1126; *see also Gerber*, 67 A.3d at 419. Virginia law similarly provides "where discretion is lodged in one of two parties to a contract . . . such discretion must, of course, be exercised in good faith." *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, at *3 (Va. Cir. 1993) (alteration in original); *see also Va. Vermiculite, Ltd. v. W.R. Grace & Co.- Conn.*, 156 F.3d 535, 542 (4th Cir. 1998).

We remand this claim, insofar as it seeks damages, for the district court to evaluate it under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties at the various times the class plaintiffs purchased their shares. We note that the class

plaintiffs specifically allege that some class members purchased their shares before the Recovery Act was enacted in July 2008 and the FHFA was appointed conservator the following September, while others purchased their shares later, but the class plaintiffs define their class action to include more broadly "all persons and entities who held shares . . . and who were damaged thereby," J.A. 262-63. The district court may need to redefine or subdivide the class depending upon what the various plaintiffs could reasonably have expected when they purchased their shares. For those who purchased their shares after the enactment of the Recovery Act and the FHFA's appointment as conservator, the analysis should consider, *inter alia*, (1) Section 4617(b)(2)(J)(ii) (authorizing the FHFA to act "in the best interests of the [Companies] or the Agency"), (2) Provision 5.1 of the Stock Agreements, J.A. 2451, 2465 (permitting the Companies to declare dividends and make other distributions only with Treasury's consent), and (3) pertinent statements by the FHFA, *e.g.*, J.A. 217 ¶ 8, referencing *Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac* (Sept. 7, 2008) (The "FHFA has placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized.").

The district court also held the class plaintiffs "fail to plead claims of breach of the implied covenant against the [Companies]" because they allege only that the FHFA's actions were arbitrary and unreasonable. *Perry Capital LLC*, 70 F. Supp. 3d at 239. This is a distinction without a difference because the action they challenge – the FHFA's adoption of the Third Amendment – was taken on behalf of the Companies.

The Companies and the FHFA are thus identically situated for purposes of this claim.

### c. Liquidation preferences

The class plaintiffs also allege the FHFA, by adopting the Third Amendment, breached the guarantees in their stock certificates and in the implied covenant to a share of the Companies' assets upon liquidation because it ensured there would be no assets to distribute. The FHFA urges us to affirm the district court's dismissal of these claims as unripe. *See Perry Capital LLC*, 70 F. Supp. 3d at 234-35.

"The ripeness doctrine generally deals with when a federal court can or should decide a case," *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012), and has both constitutional and prudential facets. Ripeness "shares the constitutional requirement of standing that an injury in fact be certainly impending." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). We decide whether to defer resolving a case for prudential reasons by "evaluat[ing] (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *see Am. Petrol.*, 683 F.3d at 386.

These claims satisfy the constitutional requirement because the class plaintiffs allege not only that the Third Amendment poses a "certainly impending" injury, *Nat'l Treasury*, 101 F.3d at 1427, but that it immediately harmed them by diminishing the value of their shares. *Cf. State Nat'l Bank v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015) (holding unripe a claim seeking recovery for a present loss in share-price in part because the plaintiffs failed to allege "their current investments are worth less now, or have been otherwise adversely affected

now"). The class plaintiffs allege the Third Amendment, by depriving them of their right to share in the Companies' assets when and if they are liquidated, immediately diminished the value of their shares. The case or controversy requirement of Article III of the U.S. Constitution is therefore met.

The FHFA (like the district court) says the claims are not prudentially ripe because there can be no breach of any contractual obligation to distribute assets until the Companies are required to perform, namely, upon liquidation. Not so. Under the doctrine of anticipatory breach, "a voluntary affirmative act which renders the obligor unable . . . to perform" is a repudiation, RESTATEMENT (SECOND) OF CONTRACTS § 250(b), that "ripens into a breach prior to the time for performance . . . if the promisee elects to treat it as such" by, for instance, suing for damages, *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002) (internal quotation marks omitted); RESTATEMENT (SECOND) OF CONTRACTS §§ 253(1), 256 cmt. c. *Accord Lenders Fin. Corp. v. Talton*, 249 Va. 182, 189, 455 S.E.2d 232, 236 (Va. 1995); *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, C.A. No. 2742-VCN, 2009 WL 458779, at *5 & n.37 (Del. Ch. Feb. 23, 2009). An anticipatory breach satisfies prudential ripeness and therefore enables the promisee to seek damages immediately upon repudiation, *Sys. Council EM-3 v. AT&T Corp.*, 159 F.3d 1376, 1383 (D.C. Cir. 1998) ("[I]f a performing party unequivocally signifies its intent to breach a contract, the other party may seek damages immediately under the doctrine of anticipatory repudiation"). In other words, anticipatory breach is "a doctrine of accelerated ripeness" because it "gives the plaintiff the option to have the law treat the promise to breach [or the act rendering performance impossible] as a breach itself." *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 294 (4th Cir. 2010) (citing *Franconia Assocs.*, 536 U.S. at 143).

The class plaintiffs' claims for breach of contract with respect to liquidation preferences are better understood as claims for anticipatory breach, so there is no prudential reason to defer their resolution.[26] Nor do we see any prudential obstacle to adjudicating the class plaintiffs' claim that repudiating the guarantee of liquidation preferences constitutes a breach of the implied covenant. Our holding that the claims are ripe sheds no light on the merit of those claims and, contrary to the assertions in the dissenting opinion (at 17), has no bearing upon the scope of the FHFA's statutory authority as conservator under the Recovery Act. Whether the class plaintiffs stated claims for breach of contract and breach of the implied covenant is best addressed by the district court in the

---

[26] Although the class plaintiffs do not describe the Third Amendment as "an anticipatory repudiation" until their reply brief, Class Pls. Reply Br. at 13, they have emphasized throughout this litigation that it "nullified – and thereby breached – the contractual rights to a liquidation distribution" by rendering performance impossible. Class Pls. Br. at 40-41; *see also, e.g.*, J.A. 223 ¶ 22 (alleging the Third Amendment "effectively eliminated the property and contractual rights of Plaintiffs and the Classes to receive their liquidation preference upon the dissolution, liquidation or winding up of Fannie Mae and Freddie Mac"); Class Pls. Opp'n to Mot. to Dismiss at 37 ("[T]he Third Amendment has made it impossible for [the Companies] ever to have . . . assets available for distribution to stockholders other than Treasury" and thereby "eliminated Plaintiffs' present . . . liquidation rights in breach of the Certificates" (internal quotation marks omitted)). The class plaintiffs allege they "paid valuable consideration in exchange for these contractual rights," which rights "had substantial market value . . . that [was] swiftly dissipated in the wake of the Third Amendment," J.A. 224 ¶ 23, causing the class plaintiffs to "suffer[] damages," *e.g.*, J.A. 269 ¶ 144.

first instance.[27] That court's earlier conclusion in the negative was made for "largely the same reasons" that it had held the claims unripe, *Perry Capital LLC*, 70 F. Supp. 3d at 236, and so must be reconsidered in light of our reversal of the court's holding on ripeness.

## V.   Conclusion

We affirm the judgment of the district court that the institutional plaintiffs' claims against the FHFA and Treasury alleging arbitrary and capricious conduct and conduct in excess of their statutory authority are barred by 12 U.S.C. § 4617(f).  We affirm the district court's dismissal of their common-law claims because they were not properly appealed.  With respect to the class plaintiffs' claims, we affirm the judgment of the district court on all claims except for the claims alleging breach of contract and breach of the implied covenant of good faith and fair dealing regarding liquidation preferences and the claim for breach of the implied covenant

---

[27] We remand the contract-based claims only insofar as they seek damages because the pleas for equitable relief are barred by 12 U.S.C. § 4617(f).  "Because ripeness is a justiciability doctrine that is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction, we consider it first." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 397 (D.C. Cir. 2008) (internal quotation marks and brackets omitted); *see also In re Aiken Cty.*, 645 F.3d 428, 434 (D.C. Cir. 2011) ("The ripeness doctrine, even in its prudential aspect, is a threshold inquiry that does not involve adjudication on the merits").  We therefore first determined the claims are ripe, *supra* at 70-73, and only then concluded the requests for equitable relief are barred by § 4617(f).

with respect to dividend rights, which claims we remand for further proceedings consistent with this opinion.

*So ordered.*

B<small>ROWN</small>, *Circuit Judge*, dissenting in part:

One critic has called it "wrecking-ball benevolence," James Bovard, Editorial, *Nothing Down: The Bush Administration's Wrecking-Ball Benevolence*, B<small>ARRON</small>'<small>S</small>, Aug. 23, 2004, http://tinyurl.com/Barrons-Bovard; while another, dismissing the compassionate rhetoric, dubs it "crony capitalism," Gerald P. O'Driscoll, Jr., Commentary, *Fannie/Freddie Bailout Baloney*, CATO I<small>NST</small>., http://tinyurl.com/Cato-O-Driscoll (last visited Feb. 13, 2017). But whether the road was paved with good intentions or greased by greed and indifference, affordable housing turned out to be the path to perdition for the U.S. mortgage market. And, because of the dominance of two so-called Government Sponsored Entities ("GSE"s)—the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie," collectively with Fannie Mae, the "Companies")—the trouble that began in the subprime mortgage market metastasized until it began to affect most debt markets, both domestic and international.

By 2008, the melt-down had become a crisis. A decade earlier, government policies and regulations encouraging greater home ownership pushed banks to underwrite mortgages to allow low-income borrowers with poor credit history to purchase homes they could not afford. Banks then used these risky mortgages to underwrite highly-profitable mortgage-backed securities—bundled mortgages—which hedge funds and other investors later bought and sold, further stoking demand for ever-riskier mortgages at ever-higher interest rates. Despite repeated warnings from regulators and economists, the GSEs' eagerness to buy these loans meant lenders had a strong incentive to make risky loans and then pass the risk off to Fannie and Freddie. By 2007, Fannie and Freddie had acquired roughly a trillion dollars' worth of subprime and nontraditional mortgages—approximately 40

percent of the value of all mortgages purchased. And since more risk meant more profit and the GSEs knew they could count on the federal government to cover their losses, their appetite for riskier mortgages was entirely rational.

The housing boom generated tremendous profit for Fannie and Freddie. But then the bubble burst. Individuals began to default on their loans, wrecking neighborhoods, wiping out the equity of prudent homeowners, and threatening the stability of banks and those who held or guaranteed mortgage-backed assets. In March 2008, Bear Sterns collapsed, requiring government funds to finance a takeover by J.P. Morgan Chase. In July, the Federal Deposit Insurance Corporation (the "FDIC") seized IndyMac. But Bear Sterns and IndyMac—huge companies, to be sure—paled in comparison to Fannie and Freddie, which together backed $5 trillion in outstanding mortgages, or nearly half of the $12 trillion U.S. mortgage market. In late-July 2008, Congress passed and President Bush signed the Housing and Economic Recovery Act of 2008, authorizing a new government agency, the Federal Housing Finance Agency ("FHFA" or the "Agency"), to serve as conservator or receiver for Fannie and Freddie if certain conditions were met; Fannie and Freddie were placed into FHFA conservatorship the following month. Only weeks thereafter, Lehman Brothers failed, the government bailed out A.I.G., Washington Mutual declared bankruptcy, and Wells Fargo obtained government assistance for its buy-out of Wachovia.

There is no question that FHFA was created to confront a serious problem for U.S. financial markets. The Court apparently concludes a crisis of this magnitude justifies extraordinary actions by Congress. Perhaps it might. But even in a time of exigency, a nation governed by the rule of law cannot transfer broad and unreviewable power to a

government entity to do whatsoever it wishes with the assets of these Companies. Moreover, to remain within constitutional parameters, even a less-sweeping delegation of authority would require an explicit and comprehensive framework. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.") Here, Congress did *not* endow FHFA with unlimited authority to pursue its own ends; rather, it seized upon the statutory text that had governed the FDIC for decades and adapted it ever so slightly to confront the new challenge posed by Fannie and Freddie.

Perhaps this was a bad idea. The perils of massive GSEs had been indisputably demonstrated. Congress could have faced up to the mess forthrightly. Had both Companies been placed into immediate receivership, the machinations that led to this litigation might have been avoided. *See* Thomas H. Stanton, *The Failure of Fannie Mae and Freddie Mac and the Future of Government Support for the Housing Finance System*, 14–15 (Brooklyn L. Sch., Conference Draft, Mar. 27, 2009), http://tinyurl.com/Stanton-Conference (arguing Fannie and Freddie could have been converted into wholly owned government corporations with limited lifespans in order to stabilize the mortgage market). But the question before the Court is not whether the good guys have stumbled upon a solution. There are no good guys. The question is whether the government has violated the legal limits imposed on its own authority.

Regardless of whether Congress had many options or very few, it chose a well-understood and clearly-defined statutory framework—one that drew upon the common law to clearly delineate the outer boundaries of the Agency's

conservator or, alternatively, receiver powers. FHFA pole vaulted over those boundaries, disregarding the plain text of its authorizing statute and engaging in *ultra vires* conduct. Even now, FHFA continues to insist its authority is *entirely without limit* and argues for a complete ouster of federal courts' power to grant injunctive relief to redress *any action* it takes while purporting to serve in the conservator role. *See* FHFA Br. 21. While I agree with much of the Court's reasoning, I cannot conclude the anti-injunction provision protects FHFA's actions here or, more generally, endorses FHFA's stunningly broad view of its own power. Plaintiffs— not all innocent and ill-informed investors, to be sure—are betting the rule of law will prevail. In this country, *everyone* is entitled to win that bet. Therefore, I respectfully dissent from the portion of the Court's opinion rejecting the Institutional and Class Plaintiffs' claims as barred by the anti-injunction provision and all resulting legal conclusions.

I.

The Housing and Economic Recovery Act of 2008 ("HERA" or the "Act"), Pub. L. No. 110-289, 122 Stat. 2654 (codified at 12 U.S.C. § 4511, *et seq.*), established a new financial regulator, FHFA, and endowed it with the authority to act as conservator or receiver for Fannie and Freddie. The Act also temporarily expanded the United States Treasury's ("Treasury") authority to extend credit to Fannie and Freddie as well as purchase stock or debt from the Companies. My disagreement with the Court turns entirely on its interpretation of HERA's text.

Pursuant to HERA, FHFA may supervise and, if needed, operate Fannie and Freddie in a "safe and sound manner," "consistent with the public interest," while "foster[ing] liquid, efficient, competitive, and resilient national housing finance

markets." 12 U.S.C. § 4513(a)(1)(B). The statute further authorizes the FHFA Director to "appoint [FHFA] as conservator *or* receiver" for Fannie and Freddie "for the purpose of reorganizing, rehabilitating, or winding up [their] affairs." *Id.* § 4617(a)(1), (2) (emphasis added). In order to ensure FHFA would be able to act quickly to prevent the effects of the subprime mortgage crisis from cascading further through the United States and global economies, HERA also provided "no court may take any action to restrain or affect *the exercise of powers or functions* of [FHFA] as a conservator or a receiver." *Id.* § 4617(f) (emphasis added).

By its plain terms, HERA's broad anti-injunction provision bars equitable relief against FHFA only when the Agency acts within its statutory authority—*i.e.* when it performs its "powers or functions." *See New York v. FERC*, 535 U.S. 1, 18 (2002) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). Accordingly, having been appointed as "conservator" for the Companies, FHFA was obligated to behave in a manner consistent with the conservator role as it is defined in HERA or risk intervention by courts. Indeed, this conclusion is consistent with judicial interpretations of HERA's sister statute and, more broadly, with the common law.

A.

FHFA's general authorization to act appears in HERA's "[d]iscretionary appointment" provision, which states, "The Agency may, at the discretion of the Director, be appointed conservator *or* receiver" for Fannie and Freddie. 12 U.S.C. § 4617(a)(2) (emphasis added). The disjunctive "or" clearly indicates FHFA may choose to behave either as a conservator or as a receiver, but it may not do both simultaneously. *See also id.* § 4617(a)(4)(D) ("The appointment of the Agency as

receiver of a regulated entity under this section shall immediately terminate any conservatorship established for the regulated entity under this chapter."). The Agency chose the first option, publicly announcing it had placed Fannie and Freddie into conservatorship on September 6, 2008 after a series of unsuccessful efforts to capitalize the Companies. They remain in FHFA conservatorship today. Accordingly, we must determine the statutory boundaries of power, if any, placed on FHFA when it functions as a conservator and determine whether FHFA stepped out of bounds.

The Court emphasizes Subsection 4617(b)(2)(B)'s general overview of the Agency's purview:

> The Agency may, as conservator or receiver—
>> (i) take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity and conduct all business of the regulated entity;
>> (ii) collect all obligations and money due the regulated entity;
>> (iii) perform all functions of the regulated entity in the name of the regulated entity which are consistent with the appointment as conservator or receiver;
>> (iv) preserve and conserve the assets and property of the regulated entity; and
>> (v) provide by contract for assistance in fulfilling any function, activity, action, or duty of the Agency as conservator or receiver.

*Id.* § 4617(b)(2)(B). From this text, the Court intuits a general statutory mission to behave as a "conservator" in virtually all corporate actions, presumably transitioning to a "receiver"

only at the moment of liquidation. Op. 27 ("[HERA] openly recognizes that sometimes conservatorship will involve managing the regulated entity in the lead up to the appointment of a liquidating receiver."); 32 ("[T]he duty that [HERA] imposes on FHFA to comply with receivership procedural protections textually turns on FHFA actually liquidating the Companies."). In essence, the Court's position holds that because there was a financial crisis and only Treasury offered to serve as White Knight, both FHFA and Treasury may take any action they wish, apart from formal liquidation, without judicial oversight. This analysis is dangerously far-reaching. *See generally* 2 James Wilson, *Of the Natural Rights of Individuals*, *in* THE WORKS OF JAMES WILSON 587 (1967) (warning it is not "part of natural liberty . . . to do mischief to anyone" and suggesting such a nonexistent right can hardly be given to the state to impose by fiat). While the line between a conservator and a receiver may not be completely impermeable, the roles' heartlands are discrete, well-anchored, and authorize essentially distinct and specific conduct.

For clarification of the general mission statement appearing in Subsection (B), the reader need only continue to read through Subsection 4617(b)(2). *See Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012) ("[T]o resolve this [statutory interpretation of HERA] issue, we need only heed Professor Frankfurter's timeless advice: '(1) Read the statute; (2) read the statute; (3) read the statute!'" (quoting Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* BENCHMARKS 196, 202 (1967))).

A mere two subsections later, HERA helpfully lists the specific "powers" that FHFA possesses once appointed conservator:

> The Agency may, as *conservator*, take such action as may be—
>> (i) necessary to put the regulated entity in a sound and solvent condition; and
>> (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.

12 U.S.C. § 4617(b)(2)(D) (emphasis added). The next subsection defines FHFA's "[a]dditional powers *as receiver*:"

> In any case in which the Agency is acting as receiver, the Agency shall place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity in such manner as the Agency deems appropriate, including through the sale of assets, the transfer of assets to a limited-life regulated entity[,] . . . or the exercise of any other rights or privileges granted to the Agency under this paragraph.

*Id.* § 4617(b)(2)(E) (emphasis added). Apparently, when the Court asserts "for all of their arguments that FHFA has exceeded the bounds of conservatorship, the institutional stockholders have no textual hook on which to hang their hats," Op. 36, it refers solely to the limited confines of Subsection 4617(b)(2)(B).

Plainly the text of Subsections 4617(b)(2)(D) and (b)(2)(E) mark the bounds of FHFA's conservator or receiver powers, respectively, if and when the Agency chooses to exercise them in a manner consistent with its general authority to "operate the regulated entity" appearing in

Subsection 4617(b)(2)(B).[1]  Of course, this is not to say FHFA may take action *if and only if* the preconditions listed in the statute are met.  Indeed, in provisions *following the specific articulation of powers contained in Subsections (D) and (E)*, and thus drafted in contemplation of the distinctions articulated in those earlier subsections, the statute lists certain powers that may be exercised by FHFA as either a "conservator or receiver."  12 U.S.C. § 4617(b)(2)(G) (power to "transfer or sell any asset or liability of the regulated entity in default" without prior approval by the regulated entity); *id.* § 4617(b)(2)(H) (power to "pay [certain] valid obligations of

---

[1] The Court makes much of the statute's statement that a conservator "*may*" take action to operate the company in a sound and solvent condition and preserve and conserve its assets while a receiver "*shall*" liquidate the company.  It concludes the statute permits, but does not compel in any judicially enforceable sense, FHFA to preserve and conserve Fannie's and Freddie's assets however it sees fit.  *See* Op. 21–25.  I disagree.  Rather, read in the context of the larger statute—especially the specifically defined powers of a conservator and receiver set forth in Subsections 4617(b)(2)(D) and (b)(2)(E)—Congress's decision to use permissive language with respect to a conservator's duties is best understood as a simple concession to the practical reality that a conservator may not always succeed in rehabilitating its ward.  The statute wisely acknowledges that it is "not in the power of any man to command success" and does not convert failure into a legal wrong.  *See* Letter from George Washington to Benedict Arnold (Dec. 5, 1775), *in* 3 THE WRITINGS OF GEORGE WASHINGTON, 192 (Jared Sparks, ed., 1834).  Of course, this does not mean the Agency may affirmatively sabotage the Companies' recovery by confiscating their assets quarterly to ensure they cannot pay off their crippling indebtedness.  There is a vast difference between recognizing that flexibility is necessary to permit a conservator to address evolving circumstances and authorizing a conservator to undermine the interests and destroy the assets of its ward without meaningful limit.

the regulated entity"). Indeed, each of these powers is entirely consistent with *either* the Subsection (D) conservator role or the Subsection (E) receiver role, and they do not override the distinctions between them. Congress cannot be expected to specifically address an entire universe of possible actions in its enacted text—assigning each to a "conservator," a "receiver," or both. *See, e.g.*, *id.* § 4617(b)(2)(C) (joint conservator/receiver power to "provide for the exercise of any function by any stockholder, director, or officer of any regulated entity"). But if a power is enumerated as that of a "receiver" (or fairly read to be a "receiver" power), FHFA cannot exercise that power while calling itself a "conservator." The statute confirms as much: the Agency "as conservator or receiver" may "exercise all powers and authorities *specifically granted to conservators or receivers, respectively*, under [Section 4617], and such *incidental powers* as shall be necessary to carry out such powers." *Id*. § 4617(J)(i) (emphasis added).

A conservator endeavors to "put the regulated entity in a sound and solvent condition" by "reorganizing [and] rehabilitating" it, and a receiver takes steps towards "liquidat[ing]" the regulated entity by "winding up [its] affairs." 12 U.S.C. § 4617(a)(2), (b)(2)(D)–(E).[2] In short, FHFA may choose whether it intends to serve as a conservator or receiver; once the choice is made, however, its "hard operational calls" consistent with its "managerial judgment" are statutorily confined to acts within its chosen

---

[2] The Director's discretion to appoint FHFA as "'conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity'" does not suggest slippage between the roles. *See* FHFA Br. 41 (quoting 12 U.S.C. § 4617(a)(2)). Between the conservator and receiver roles, FHFA surely has the power to accomplish each of the enumerated functions; nonetheless, a conservator can no more "wind[] up" a company than a receiver can "rehabilitat[e]" it. *See* 12 U.S.C. § 4617(b)(3)(B) (using "liquidation" and "winding up" as synonyms).

role. *See* Op. 23. There is no such thing as a hybrid conservator-receiver capable of governing the Companies in any manner it chooses up to the very moment of liquidation. *See* Op. 55–56 (noting HERA "terminates [shareholders] rights and claims" in receivership and acknowledging shareholders' direct claims against and rights in the Companies survive during conservatorship).[3]

Moreover, it is the proper role of courts to determine whether FHFA's challenged actions fell within its statutorily-defined conservator role. In *County of Sonoma v. FHFA*, for example, when our sister circuit undertook this inquiry, it observed, "If the [relevant] directive falls within FHFA's conservator powers, it is insulated from review and this case must be dismissed," but "[c]onversely, the anti-judicial review provision is inapplicable when FHFA acts beyond the scope of its conservator power." 710 F.3d 987, 992 (9th Cir. 2013); *see also Leon Cty. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012) ("FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp."). Here, the Court abdicates this crucial responsibility, blessing FHFA with unreviewable discretion over any action—short of formal liquidation—it takes towards its wards.

B.

But HERA does not exist in an interpretive vacuum. Congress imported the powers and limitations FHFA enjoys

---

[3] HERA's provision for judicial review over a claim promptly filed "within 30 days" of the Director's decision to appoint a conservator or receiver further indicates Congress contemplated continuity of the conservator or receiver role during the period the conservatorship or receivership endured. 12 U.S.C. § 4617(a)(5). Here, therefore, in transitioning *sub silencio* from the conservator to receiver role, FHFA has escaped the statute's contemplated, though admittedly brief, period for judicial review following the transition.

in its "conservator" and "receiver" roles, as well as the insulation from judicial review that accompanies them, directly from the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, which governs the FDIC. *See* Mark A. Calabria, *The Resolution of Systemically Important Financial Institutions: Lessons from Fannie and Freddie* 10 (Cato Inst., Working Paper No. 25, 2015), http://tinyurl.com/Cato-Working-Paper ("In crafting the conservator and receivership provisions . . . the Committee staff . . . quite literally 'marked up' Sections 11 and 13 of the [Federal Deposit Insurance Act ("FDIA"), FIRREA's predecessor statute] . . . . The presumption was that FDIA powers would apply to a GSE resolution, unless there was a compelling reason otherwise."). Our interpretation of conservator powers and the judiciary's role in policing their boundaries under HERA is, therefore, guided by congressional intent expressed in FIRREA and the case law interpreting it. *See Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978) (noting when "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law" and to have "adopte[d] that interpretation"); *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("Statutory provisions *in pari materia* normally are construed together to discern their meaning."); *see also* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947) [hereinafter *Reading of Statutes*] ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.").

In language later copied word-for-word into HERA, FIRREA lists the FDIC's powers "as conservator or receiver," 12 U.S.C. § 1821(d)(2)(A)–(B), and it later lists the FDIC's "[p]owers as conservator" alone, *id.* § 1821(d)(2)(D). Save

for references to a "regulated entity" in place of a "depository institution," the conservator powers delineated in the two statutes are *identical*. In fact, FIRREA's text demonstrates the Legislature's clear intent to create a textual distinction between conservator and receiver powers:

> The FDIC is authorized to act as conservator or receiver for insured banks and insured savings associations that are chartered under Federal or State law. The title also distinguishes between the powers of a conservator and receiver, *making clear that a conservator operates or disposes of an institution as a going concern while a receiver has the power to liquidate and wind up the affairs of an institution.*

H.R. REP. NO. 101-209, at 398 (1989) (Conf. Rep.) (emphasis added). Courts have respected this delineation, noting "Congress did not use the phrase 'conservator or receiver' loosely." *1185 Ave. of Americas Assocs. v. RTC*, 22 F.3d 494, 497 (2d Cir. 1994) ("Throughout FIRREA, Congress used 'conservator or receiver' where it granted rights to both conservators and receivers, and it used 'conservator' or 'receiver' individually where it granted rights to the [agency] in only one capacity.").

FIRREA had assigned to "conservators" responsibility for taking "such action as may be . . . necessary to put the insured depository institution in a sound and solvent condition; and . . . appropriate to carry on the business of the institution and preserve and conserve [its] assets," 12 U.S.C. § 1821(d)(2)(D), and it imposed upon them a "fiduciary duty to minimize the institution's losses," 12 U.S.C. § 1831f(d)(3). "Receivers," on the other hand, "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution." *Id.* § 1821(d)(2)(E). The proper

interpretation of the text is unmistakable: "a conservator may operate and dispose of a bank as a going concern, while a receiver has the power to liquidate and wind up the affairs of an institution." *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1090 (D.C. Cir. 1996); *see also, e.g.*, *Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355, 361 (9th Cir. 1995) ("The RTC [a government agency similar to the FDIC], as conservator, operates an institution with the hope that it might someday be rehabilitated. The RTC, as receiver, liquidates an institution and distributes its proceeds to creditors according to the priority rules set out in the regulations."); *RTC v. United Tr. Fund, Inc.*, 57 F.3d 1025, 1033 (11th Cir. 1995) ("The conservator's mission is to conserve assets[,] which often involves continuing an ongoing business. The receiver's mission is to shut a business down and sell off its assets. A receiver and conservator consider different interests when making . . . strategic decision[s]."). The two roles simply do not overlap, and any conservator who "winds up the affairs of an institution" rather than operate it "as a going concern"—within the context of a formal liquidation or not—does so outside its authority as conservator under the statute.

Of course, parameters for the "conservator" and "receiver" roles are not the only things HERA lifted directly from FIRREA. The anti-injunction clause at issue here came too. Section 1821(j) of FIRREA provided, "[N]o court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." 12 U.S.C. § 1821(j). Another near-perfect fit.

Indeed, *National Trust for Historic Preservation in the United States v. FDIC* emphasized that, while FIRREA's anti-injunction clause prevented review of the FDIC's actions

where it had "exercise[d the] powers or functions" granted to it as "conservator or receiver," the Court retained the ability to decide claims alleging the agency "ha[d] acted or propose[d] to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions." 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring); *see also Freeman v. FDIC*, 56 F.3d 1394, 1398 (D.C. Cir. 1995) ("'[Section] 1821(j) does indeed bar courts from restraining or affecting the exercise of powers or functions of the FDIC as a conservator or a receiver . . . unless it has acted or proposed to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.'" (quoting *Nat'l Tr. for Historic Pres.*, 21 F.3d at 472 (Wald, J., concurring))). Insulating all actions *within* the conservator role is an entirely different proposition from exempting actions *outside* that role, and this Circuit's precedent leaves no doubt that a thorough analysis is required to determine where on the continuum an agency stands before applying FIRREA's—or HERA's—anti-injunction clause to bar a plaintiff's claims.

## C.

When Congress lifted HERA's conservatorship standards verbatim from FIRREA, it also incorporated the long history of fiduciary conservatorships at common law baked into that statute. Indeed, "[i]t is a familiar maxim that a statutory term is generally presumed to have its common-law meaning." *Evans v. United States*, 504 U.S. 255, 259 (1992); *see Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will

convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."); *see generally* Roger J. Traynor, *Statutes Revolving in Common-Law Orbits*, 17 CATH. U. L. REV. 401 (1968) (discussing the interaction between statutes and judicial decisions across a number of fields, including commercial law). As Justice Frankfurter colorfully put it, "[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Reading of Statutes*, *supra*, at 537.

We have an obvious transplant here. At common law, "conservators" were appointed to protect the legal interests of those unable to protect themselves. In the probate context, for example, a conservator was bound to act as the fiduciary of his ward. *See In re Kosmadakes*, 444 F.2d 999, 1004 (D.C. Cir. 1971). This duty forbade the conservator—whether overseeing a human or corporate person—from acting for the benefit of the conservator himself or a third party. *See RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1453–54 (8th Cir. 1992) (observing "[a]t least as early as the 1930s, it was recognized that the purpose of a conservator was to maintain the institution as an ongoing concern," and holding "the distinction in duties between [RTC] conservators and receivers" is thus not "more theoretical than real").[4]

Consequently, today's *Black's Law Dictionary* defines a "conservator" as a "guardian, protector, or preserver," while a "receiver" is a "disinterested person appointed . . . for the protection or collection of property that is the subject of

---

[4] While the execution of multiple contracts with Treasury "bears no resemblance to the type of conservatorship measures that a private common-law conservator would be able to undertake," Op. 34, that is a distinction in degree, not in kind.

diverse claims (for example, because it belongs to a bankrupt [entity] or is otherwise being litigated)." BLACK'S LAW DICTIONARY 370, 1460 (10th ed. 2014). These "[w]ords that have acquired a specialized meaning in the legal context must be accorded their *legal* meaning." *Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Human Res.*, 532 U.S. 598, 615 (2001) (Scalia, J., concurring).[5] They comprise the common law vocabulary that Congress chose to employ in FIRREA and, later, in HERA to authorize the FDIC and FHFA to serve as "conservators" in order to "preserve and conserve [an institution's] assets" and operate that institution in a "sound and solvent" manner. 12 U.S.C. § 1821(d)(2)(D).

The word "conservator," therefore, is not an infinitely malleable term that may be stretched and contorted to encompass FHFA's conduct here and insulate Plaintiffs' APA claims from judicial review. Indeed, the Court implicitly acknowledges this fact in permitting the Class Plaintiffs to mount a claim for anticipatory breach of the promises in their shareholder agreements. *See* Op. 71–73. A proper reading of the statute prevents FHFA from exceeding the bounds of the conservator role and behaving as a *de facto* receiver.

The Court suggests FHFA's incidental power to, "as conservator or receiver[,] . . . take any action authorized by [Section 4617], which the Agency determines is in the best

---

[5] These legal definitions are reflected in the terms' ordinary meaning. For example, the *Oxford English Dictionary* defines a "conservator" as "[a]n officer appointed to conserve or manage something; a keeper, administrator, trustee of some organization, interest, right, or resource." 3 OXFORD ENGLISH DICTIONARY 766 (2d ed. 1989). In contrast, it defines a "receiver" as "[a]n official appointed by a government . . . to receive . . . monies due; a collector." 13 OXFORD ENGLISH DICTIONARY 317–18 (2d ed. 1989). Regardless of the terms' audience, therefore, a "conservator" protects and preserves assets for an entity while a "receiver" operates as a collection agent for creditors.

interests of the regulated entity *or the Agency*" in 12 U.S.C. § 4617(b)(2)(J)(ii) erases any outer limit to FHFA's statutory powers despite the common law definition of "conservator" and, therefore, forecloses *any* opportunity for meaningful judicial review of FHFA's actions in conducting its so-called conservatorship at the time of the Third Amendment. *See* Op. 33–34. Of course, the Court's reading of Subsection 4617(b)(2)(J)(ii) directly contradicts the immediately-preceding subsection's authorization of FHFA "as conservator or receiver" to "exercise all powers and authorities specifically granted *to conservators or receivers, respectively*." 12 U.S.C. § 4617(b)(2)(J)(i) (emphasis added). It also upends Subsection 4617(a)(5)'s provision of judicial review for actions FHFA may take in certain facets of its receiver role. But even if that were not the case, Supreme Court precedent requires *an affirmative act by Congress*—an explicit "instruct[ion]" that review should proceed in a "contrary" manner—to authorize departure from a common law definition. *Morissette*, 342 U.S. at 263. And given the potential for disruption in the financial markets discussed in Part III *infra*, one would expect Congress to express itself explicitly in this matter. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). Congress offered no such statement here.

Rather, the more appropriate reading of the relevant text merely permits FHFA to engage in self-dealing transactions, an authorization otherwise inconsistent with the conservator role. *See Gov't of Rwanda v. Johnson*, 409 F.3d 368, 373 (D.C. Cir. 2005) (discussing "the age-old principle applicable to fiduciary relationships that, unless there is a full disclosure by the agent, trustee, or attorney of his activity and interest in

the transaction to the party he represents and the obtaining of the consent of the party represented, the party serving in the fiduciary capacity cannot receive any profit or emolument from the transaction"); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1108.09 (16th ed.) (noting a trustee's duty of loyalty in bankruptcy law requires a "single-minded devotion to the interests of those on whose behalf the trustee acts"). FHFA operating as a conservator may act in its own interests to protect both the Companies and the taxpayers from whom the Agency was ultimately forced to borrow, but FHFA is not empowered to jettison every duty a conservator owes its ward, and it is certainly not entitled to disregard the statute's own clearly defined limits on conservator power.

In fact, FIRREA contains a nearly identical self-dealing provision, which provides, "The [FDIC] may, as conservator or receiver . . . take any action authorized by this chapter, which the [FDIC] determines is in the best interests of the depository institution, its depositors, or the [FDIC]." 12 U.S.C. § 1821(d)(2)(J)(ii). This authorization has not given courts pause in interpreting FIRREA to require the FDIC to behave within its statutory role. *See Nat'l Tr. for Historic Pres.*, 21 F.3d at 472 (Wald, J., concurring) ("[Section] 1821(j) does indeed bar courts from restraining or affecting the exercise of powers or functions of the FDIC as a conservator or a receiver, unless it has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions."); *see also Sharpe v. FDIC*, 126 F.3d 1147, 1155 (9th Cir. 1997) (holding the statutory bar on judicial review of the FDIC's actions taken as a conservator or receiver "does not bar injunctive relief when the FDIC has acted beyond, or contrary

to, its statutorily prescribed, constitutionally permitted, powers or functions").[6]

## II.

Having determined this Court may enjoin FHFA if it exceeded its powers as conservator of Fannie and Freddie, I now examine FHFA's conduct. It is important to note at the outset the *motives* behind any actions taken by FHFA are irrelevant to this inquiry, as no portion of HERA's text invites such an analysis. Rather, I examine whether or not FHFA acted beyond its authority, looking only to whether its actions are consistent either with (1) "put[ting] the regulated entity in a sound and solvent condition" by "reorganizing [and] rehabilitating" it as a conservator or (2) taking steps towards "liquidat[ing]" it by "winding up [its] affairs" as a receiver. 12 U.S.C. § 4617(a)(2), (b)(2)(D)–(E).

In September 2008, FHFA placed Fannie and Freddie into conservatorship; Director James Lockhart explained the conservatorship as "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations" and promised FHFA would "act as the conservator to operate [Fannie and Freddie] until they are stabilized." Press Release, Fed. Hous. Fin. Agency,

---

[6] The Court also suggests the authority to act "'in the best interests of the regulated entity or *the Agency*'" is consistent with the Director's mandate to protect the "'public interest.'" Op. 8 (quoting 12 U.S.C. § 4513(a)(1)(B)(v)). Of course, the FHFA Director is also bound to "carr[y] out [FHFA's] statutory mission only through activities that are authorized under and consistent with this chapter and the authorizing statutes." *Id.* § 4513(a)(1)(B)(iv). Indeed, this text only confirms what should have been evident: the availability of meaningful judicial review cannot bend to exigency, especially since Congress clearly did not believe the 2008 financial crisis required a more far-reaching statutory authorization than prior occasions of financial distress had commanded.

Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008), http://tinyurl.com/Lockhart-Statement. FHFA even promised it would "continue to retain all rights in the [Fannie and Freddie] stock's financial worth; as such worth is determined by the market." JA 2443 (FHFA Fact Sheet containing "Questions and Answers on Conservatorship"). And, for a period of time thereafter, FHFA did in fact manage the Companies within the conservator role. It even enlisted Treasury to provide cash infusions that, while costly, preserved at least a portion of the value of the market-held shares in the corporations.

But the tide turned in August 2012 with the Third Amendment and its "Net Worth Sweep," transferring nearly all of the Companies' profits into Treasury's coffers. Specifically, the Third Amendment replaced Treasury's right to a fixed-rate 10 percent dividend with the right to sweep Fannie and Freddie's entire quarterly net worth (except for an initial capital reserve, which initially totaled $3 billion and will decline to zero by 2018). Additionally, the agreement provided that, regardless of the amount of money paid to Treasury as part of this Net Worth Sweep dividend, Fannie and Freddie would continue to owe Treasury the $187.5 billion it had originally loaned the Companies. It was, to say the least, a highly unusual transaction. Treasury was no longer another, admittedly very important, investor entitled to a preferred share of the Companies' profits; it had received a contractual right from FHFA to loot the Companies to the guaranteed exclusion of all other investors.

In an August 2012 press release summarizing the Third Amendment's terms, Treasury took a very different tone from Lockhart's 2008 statement: "[W]e are taking the next step toward responsibly *winding down* Fannie Mae and Freddie

Mac, while continuing to support the necessary process of repair and recovery in the housing market." Press Release, Dep't of Treasury, Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012), http://tinyurl.com/Treasury-Press-Release (emphasis added). Treasury further noted the Third Amendment would achieve the "important objective[]" of "[a]cting upon the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.* The Acting FHFA Director echoed Treasury's sentiment in April 2013, explaining to Congress the following year the Net Worth Sweep would "wind down" Fannie and Freddie and "reinforce the notion that [they] will not be building capital as a potential step to regaining their former corporate status." Statement of Edward J. DeMarco, Acting Director, FHFA, Before the S. Comm. on Banking, Hous. & Urban Affairs (Apr. 18, 2013), http://tinyurl.com/DeMarco-Statement.

The evolution of FHFA's position from 2008 to 2013 is remarkable; it had functionally removed itself from the role of a HERA conservator. FHFA and Treasury even described their actions using HERA's *exact phrase defining a receiver's conduct*, yet FHFA still purported to exercise only its power as a conservator and operated free from HERA's constraints on receivers. *See* 12 U.S.C. § 4617(a)(4)(D), (b)(2)(E), (b)(3), (c) (establishing liquidation procedures and priority requirements); *id.* § 4617(a)(5) (providing for judicial review).

The shift in policy was borne out in FHFA's and Treasury's actions. Indeed, all parties agree the Net Worth Sweep had the effect of replacing a fixed-rate dividend with a quarterly transfer of each company's net worth above an

initial (and declining) capital reserve of $3 billion. There is similarly no dispute that Treasury collected a $130 billion dividend in 2013, $40 billion in 2014, and $15.8 billion in 2015. In fact, during the period from 2008 to 2015, Fannie and Freddie together paid Treasury $241.2 billion, an amount well in excess of the $187.5 billion Treasury loaned the Companies. FHFA's decision to strip these cash reserves from Fannie and Freddie, consistently divesting the Companies of their near-entire net worth, is plainly antithetical to a conservator's charge to "preserve and conserve" the Companies' assets.

Of course, and as the Court observes, Op. 29–31, Fannie and Freddie continue to operate at a profit. Indeed, as early as the second quarter of 2012, the Companies had outearned Treasury's 10 percent cash dividend. Nonetheless, the Net Worth Sweep imposed through the Third Amendment— which was executed shortly after the second quarter 2012 earnings were released—confiscated all but a small portion of Fannie's and Freddie's profits. The maximum reserve of $3 billion, given the Companies' enormous size, rendered them extremely vulnerable to market fluctuations and risked triggering a need to once again infuse Fannie and Freddie with taxpayer money. *See* JA 1983 (2012 SEC filing stating "there is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that [Fannie] currently anticipate[s], such as home prices and unemployment, may cause [its] future credit-related expenses or income and credit losses to vary significantly from [its then-]current expectations"). In fact, FHFA has since referred to the Companies, even with their several-billion-dollar cushion, as "effectively balance-sheet insolvent" and "a textbook illustration of instability." Defs. Mot. to Dismiss at 19, *Samuels v. FHFA*, No. 13-cv-22399 (S.D. Fla. Dec. 6, 2013), ECF No. 38; *see also*

*generally,* Statement of Melvin L. Watt, Director, FHFA, Statement Before the H. Comm. on Fin. Servs., at 3 (Jan. 27, 2015), http://tinyurl.com/Watt-Statement ("[U]nder the terms of the [contracts with Treasury], the [Companies] do not have the ability to build capital internally while they remain in conservatorship."). As time went on, and the maximum reserve decreased, the situation only deteriorated. Given the task of replicating their successful rise each quarter amid volatile market conditions, it is surprising the Companies managed to maintain consistent profitability until 2016, when Freddie Mac posted a $200 million loss in the first quarter. *See* FREDDIE MAC, FORM 10-Q FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2016, at 7 (May 3, 2016). Under the circumstances, it strains credulity to argue FHFA was acting as a conservator to "observe[ Fannie's and Freddie's] economic performance over time" and consider other regulatory options when it executed the Third Amendment. Op. 33. FHFA and Treasury are not "studying" the Companies, they are profiting off of them![7]

Nonetheless, the Court suggests the Third Amendment was simply a logical extension of the principles articulated in the prior two agreements. Op. 25–26. This is incorrect; the Net Worth Sweep fundamentally transformed the relationship between the Companies and Treasury: a 10 percent dividend became a sweep of the Companies' near-entire net worth; an in-kind dividend option disappeared in favor of cash

---

[7] Similarly, any argument that the Third Amendment was executed to avoid a downward spiral hardly saves FHFA at this juncture. *See, e.g.*, Op. 31–32. As an initial matter, the contention rests entirely upon an examination of motives. *But see id.* 32 (confirming motives are irrelevant to the legal inquiry). Second, even if one were to consider motives, the availability of an in-kind dividend and information recently obtained in this litigation creates, to put it mildly, a dispute of fact regarding the motivations behind FHFA and Treasury's decision to execute the Third Amendment.

payments; the ability to retain capital above and beyond the required dividend payment evaporated; and, most importantly, the Companies lost any hope of repaying Treasury's liquidation preference and freeing themselves from its debt. Indeed, the capital depletion accomplished in the Third Amendment, regardless of motive, is patently incompatible with any definition of the conservator role. Outside the litigation context, even FHFA agrees: "As one of the primary objectives of conservatorship of a regulated entity would be restoring that regulated entity to a sound and solvent condition, allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." 76 Fed. Reg. 35,724, 35,727 (June 20, 2011). But rendering Fannie and Freddie mere pass-through entities for huge amounts of money destined for Treasury does exactly that which FHFA has deemed impermissible. Even Congress, in debating the Consolidated Appropriations Act of 2016, H.R. 2029, 114th Cong. § 702 (2015), acknowledged such action would require additional congressional authorization. *See* 161 Cong. Rec. S8760 (daily ed. Dec. 17, 2015) (statement of Sen. Corker) (noting the Senate Banking Committee passed a bipartisan bill to "protect taxpayers from future economic down-turns by replacing Fannie and Freddie with a privately capitalized system" that ultimately did not receive a vote by the full Senate).

Here, FHFA placed the Companies in *de facto* liquidation—inconsistent even with "managing the regulated entit[ies] in the lead up to the appointment of a liquidating receiver," as the Court incorrectly, and obliquely, defines the outer limits of the conservator role, Op. 27—when it entered into the Third Amendment and captured nearly all of the

26

Companies' profits for Treasury. To paraphrase an aphorism usually attributed to Everett Dirksen, a hundred billion here, a hundred billion there, and pretty soon you're talking about real money. But instead of acknowledging the reality of the Companies' situation, the Court hides behind a false formalism, establishing a dangerous precedent for future acts of FHFA, the FDIC, and even common law conservators.

III.

Finally, the practical effect of the Court's ruling is pernicious. By holding, contrary to the Act's text, FHFA need not declare itself as either a conservator or receiver and then act in a manner consistent with the well-defined powers associated with its chosen role, the Court has disrupted settled expectations about financial markets in a manner likely to negatively affect the nation's overall financial health.

Congress originally established the FDIC to rebuild confidence in our nation's banking system following the Great Depression, *see* Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162, and in the years that followed it has empowered the institution to insure deposits and serve as a conservator or receiver for failed banks, *see* Federal Deposit Insurance Act of 1950, Pub. L. No. 81-979, 64 Stat. 873 (FIRREA's predecessor statute, which incorporated the conservator and receiver roles). Consistent with its mission, the FDIC has provided assistance, up to and including conservatorship and receivership, for thousands of financial institutions over numerous periods of economic stress. For decades, investors relied on the common law's conservator/receiver distinction, maintained by the FDIC and enforced by courts, to evaluate their investments and guide judicial review.

Congress chose to import this effective statutory scheme into HERA in an effort to combat our most recent financial crisis, evidencing its belief that FIRREA's terms were equal to the task confronting FHFA. But FHFA's actions in implementing the Net Worth Sweep "bear no resemblance to actions taken in conservatorships or receiverships overseen by the FDIC." Amicus Br. for Indep. Comm. Bankers of Am. 6 (reflecting the views of former high-ranking officials of the FDIC). Yet today the Court holds that, in the context of HERA—and FIRREA by extension—any action taken by a regulator claiming to be a conservator (short of officially liquidating the company) is immunized from meaningful judicial scrutiny. All this in the context of the Third Amendment's Net Worth Sweep, which comes perilously close to liquidating Fannie and Freddie by ensuring they have no hope of survival past 2018. The Court's conservator is not your grandfather's, or even your father's, conservator. Rather, the Court adopts a dangerous and radical new regime that introduces great uncertainty into the already-volatile market for debt and equity in distressed financial institutions.

Now investors in regulated industries must invest cognizant of the risk that some conservators may abrogate their property rights entirely in a process that circumvents the clear procedures of bankruptcy law, FIRREA, and HERA. Consequently, equity in these corporations will decrease as investors discount their expected value to account for the increased uncertainty—indeed if allegations of regulatory overreach are entirely insulated from judicial review, private capital may even become sparse. Certainly, capital will become more expensive, and potentially *prohibitively* expensive during times of financial distress, for all regulated financial institutions.

More ominously, the existence of a predictable rule of law has made America's enviable economic progress possible. *See, e.g.*, TOM BETHELL, THE NOBLEST TRIUMPH: PROPERTY AND PROSPERITY THROUGH THE AGES 3 (1998) ("When property is privatized, and the rule of law is established, in such a way that all including the rulers themselves are subject to the same law, economies will prosper and civilization will blossom."). Private individual and institutional investors in regulated industries rightly expect the law will protect their financial rights—either through an agency interpreting statutory text or a court reviewing agency action thereafter. They are also entitled to expect a conservator will act to conserve and preserve the value of the company in which they have invested, honoring the capital and investment conventions of governing law. A rational investor contemplating the terms of HERA would not conclude Congress had changed these prevailing norms. *See generally Yates v. United States*, 135 S. Ct. 1074, 1096 (2015) (Kagan, J., dissenting) (noting statutory text may be drafted "to satisfy audiences other than courts"). Today, however, the Court explains this rational investor was wrong. And its bold and incorrect statutory interpretation could dramatically affect investor and public confidence in the fairness and predictability of the government's participation in conservatorship and insolvency proceedings.

When assessing responsibility for the mortgage mess there is, as economist Tom Sowell notes, plenty of blame to be shared. Who was at fault? "The borrowers? The lenders? The government? The financial markets? The answer is yes. All were responsible and many were irresponsible." THOMAS SOWELL, THE HOUSING BOOM AND BUST 28 (2009). But that does not mean more irresponsibility is the solution. Conservation is not a synonym for nationalization. Confiscation may be. But HERA did not authorize either, and

FHFA may not do covertly what Congress did not authorize explicitly.  What might serve in a banana republic will not do in a constitutional one.

*\*\**

FHFA, like the FDIC before it, was given broad powers to enable it to respond in a perilous time in U.S. financial history.  But with great power comes great responsibility.  Here, those responsibilities and the authority FHFA received to address them were well-defined, and yet FHFA disregarded them.  In so doing, FHFA abandoned the protection of the anti-injunction provision, and it should be required to defend against the Institutional and Class Plaintiffs' claims.